BRIAN A. VOGEL (No. 167413)
LAW OFFICES OF BRIAN A. VOGEL, PC
770 County Square Drive, Suite 104
Ventura, CA 93003
Telephone: (805) 654-0400
Facsimile: (805) 654-0326
E-Mail: brian@bvogel.com
Attorneys for Plaintiff Charles Holmes

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES HOLMES, an individual, | 3:16-cv-02458-MMA-BLM |
| Plaintiff, | *SECOND AMENDED* **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | |
| DR. ESTOCK, in her official and individual capacities; J. CLARK KELSO, an Official, as Receiver of the California Corrections Health Care Services Unit, in his official capacity; SCOTT KERNAN, an Official, as Secretary of the California Department of Corrections and Rehabilitation, in his official capacity; EDMUND G. BROWN, an Official, as Governor of the State of California, in his official capacity; WARREN L. MONTGOMERY, an Official, as Warden of Calipatria State Prison, in his official capacity; MUHAMMAD NASIR, an Official, as Health Care CEO of Calipatria State Prison, in his official capacity; DR. THERESA CURRIER, an Official, as custodial primary care physician for Plaintiff, in her individual capacity, and DOES 1-10, inclusive, | 1. 42 U.S.C. 1983; Deliberate Indifference to an Inmate's Serious Medical Needs (Eighth Amendment). |
| Defendants. | |

1

# I. INTRODUCTION

1. This is a civil action for compensatory damages and injunctive relief arising out of Defendants' deliberate indifference to Plaintiff's serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff seeks redress for deprivation of his rights, privileges and immunities, secured by the Eighth Amendment to the United States Constitution.

2. Plaintiff is an inmate serving a life sentence under the care, custody and control of the California Department of Corrections and Rehabilitation ("CDCR"). He is currently housed at Calipatria State Prison ("CSP-CAL") in Imperial County, California. During the time period relevant to the complaint, he was also housed at the California State Prison-Sacramento ("CSP-SAC") in Sacramento County, California.

3. Plaintiff came into the custody of the CDCR in 2012 with a congenital defect in his left kidney requiring medical treatment. From 2012 until July 2014, Plaintiff was treated by two qualified and diligent urologists, Dr. Fawcett and Dr. David Hadley. Both recommended further surgical intervention at University of California San Diego ("UCSD") to treat his kidney which was not draining properly either due to an obstruction ("stricture"), or because his ureter (the valve connecting the kidney to the bladder), was enlarged and allowed urine from the bladder to flow backwards into the kidney, ("reflux"), or both. Prior to his transfer to CSP-SAC in July 2014, Plaintiff's nephrostomy tube was removed after Plaintiff developed an infection. Contrary to the advice of his urologist, Dr. David Hadley, the tube was never replaced.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4.      For the past four years, Plaintiff's kidney and ureter have not been draining urine normally resulting in swelling (hydronephrosis) and chronic and painful urinary tract infections.  Mr. Holmes has been diagnosed with a damaged ureter, vesicouretral reflux, a possible stricture in his kidney, and stage 4 hydronephrosis in his left kidney.  His condition has not improved and these diagnoses put him at grave risk for renal failure.

5.      Plaintiff retained a renowned urologist and professor of Urology at University of California Los Angeles ("UCLA") Medical Center, Dr. Dudley Danoff, to review Plaintiff's medical history and render an opinion regarding the care and treatment Plaintiff has received while in custody.  Dr. Danoff's report and the voluminous supporting medical records have been disclosed to counsel for all defendants.

6.       Dr. Danoff, has opined, in essence, that in the absence of medically necessary care to insure proper drainage of Mr. Holmes' chronically infected left kidney with a nephrostomy tube, stent or through a more permanent surgical repair, the loss of kidney functionality in one or both [of Plaintiff's] kidneys is inevitable.  Based upon the most recent medical records reviewed by Dr. Danoff from February 2018, it is evident that Holmes continues to have severe hydrophrenosis with the inability to empty the kidney as well as a reflux with a megaureter.

7.      Since July 15, 2014, Mr. Holmes has not received the medical care necessary to avert permanent damage to his kidney(s).  Instead, Mr. Holmes has been transferred to various prisons several times and been treated only with antibiotics for his persistent and painful urinary tract infections.  Defendant CURRIER has also stopped giving Plaintiff pain medications while he suffers from persistent urinary tract infections.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

8. Plaintiff contends that Defendants' failure to surgically repair or remove his chronically infected left kidney has caused him to needlessly suffer severe pain and emotional distress for years and that the Defendants have been deliberately indifferent to his serious medical needs.

## II. JURISDICTION AND VENUE

9. Subject matter jurisdiction for this action is conferred upon this Court pursuant to 28 U.S.C. §§1331 and 1343, as it arises under 42 U.S.C. §1983.

10. Venue is properly in this Court, pursuant to Title 28 U.S.C § 1391, as this judicial district is the residence of one or more of the Defendants, all of the Defendants are believed to be residents of the State of California, all of the acts and omissions complained of occurred in California, and Plaintiff is currently incarcerated in this district.

## III. PARTIES

**A. ORIGINAL DEFENDANTS**

11. Defendant E. ESTOCK M.D. ("ESTOCK") resides in Imperial County, and is employed as a doctor at CSP-CAL. At all times relevant to this complaint, ESTOCK was a doctor employed at CSP-CAL and was Plaintiff's primary care physician at CSP-CAL prior to his transfer to CSP-SAC on July 15, 2014. She is sued in her individual and official capacities.

12. Because Plaintiff does not currently possess significant, additional facts beyond what was pled in the First Amended Complaint, Defendants K. Ball, D.O. ("BALL"), S. CHAIKEN, Ph.D ("CHAIKEN") and C. REGULES ("REGULES") have not been named as defendants herein.

**B. ADDITIONAL DEFENDANTS ADDED IN FIRST AMENDED COMPLAINT**

13. Defendant J. Clark Kelso ("KELSO") is the current head, as Receiver, of the California Corrections Health Care Services Unit ("CCHCS"). He is

responsible for CCHCS which is an agency of the State of California that has been responsible for the health care of the State of California's prison system since October 3, 2005, after the decision in *Plata v. Brown*, Case No. 01-1351 [Northern District of California] held that the inadequate provision of health care in California prisons violated the Eighth Amendment.  On February 14, 2006, the Court in *Plata* specifically ordered that "the Receiver shall exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system." *Plata v. Brown*, *supra,* ECF 473.  As the Receiver appointed to oversee the administration, control, management, operation and financing of the CCHCS, Defendant KELSO has the authority to comply with any order made by this court authorizing injunctive relief to remedy Plaintiff's condition. Defendant KELSO is liable for maintaining policies, customs, and practices which were the moving force of the constitutional deprivations Plaintiff has suffered.

14.     Defendant Scott Kernan ("KERNAN") is the current Secretary of the California Department of Corrections and Rehabilitation (CDCR). He assumed that position as of December 2015.  CDCR is the agency that administers all of California's prisons and is responsible for all inmates in its custody.  CDCR has approximately 170,000 prisoners under its authority and has a budget of $9 billion, making it the State's largest agency.  KERNAN is responsible for the policies and practices of the organization.  In setting and maintaining those policies and practices, KERNAN personally acted to deprive Plaintiff of his rights and failed to act to protect Plaintiff from the constitutional injuries detailed herein.  As the Secretary of CDCR, Defendant KERNAN, in conjunction with the powers vested in Defendant KELSO as the Receiver appointed to oversee the administration, control, management, operation and financing of the CCHCS, has

the authority to comply with any order made by this court authorizing injunctive relief to remedy Plaintiff's condition. Defendant KERNAN is liable for maintaining policies, customs, and practices which were the moving force of the constitutional deprivations Plaintiff has suffered.

15. Defendant Edmund G. Brown ("Governor BROWN") is the current Governor of the State of California, having succeeded Former Governor Arnold Schwarzenegger in January, 2011.  Governor BROWN had the authority and the means to establish or to discontinue correctional authority policies and practices, including the policies that resulted in the failure to provide adequate medical care to Plaintiff.  As the Governor of the State of California, Defendant BROWN, in conjunction with the powers vested in Defendant KELSO as the Receiver appointed to oversee the administration, control, management, operation and financing of the CCHCS, has the authority to comply with any order made by this court authorizing injunctive relief to remedy Plaintiff's condition. Defendant BROWN is liable for maintaining policies, customs, and practices which were the moving force of the constitutional deprivations Plaintiff has suffered.

16. Defendant Warren L. Montgomery ("MONTGOMERY") is the warden at CSP-CAL.  As the warden at CSP-CAL, Defendant MONTGOMERY, in conjunction with the powers vested in Defendant KELSO as the Receiver appointed to oversee the administration, control, management, operation and financing of the CCHCS, has the authority to comply with any order made by this court authorizing injunctive relief to remedy Plaintiff's condition.  Defendant MONTGOMERY is liable for maintaining policies, customs, and practices which were the moving force of the constitutional deprivations Plaintiff has suffered. Defendant MONTGOMERY was aware that a substantial risk of serious harm has existed to Plaintiff and the substantial risk has been obvious.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

17.     Defendant Muhammad Nasir ("NASIR") is the current Health Care CEO at CSP-CAL.  As the Health Care CEO at CSP-CAL, Defendant NASIR, in conjunction with the powers vested in Defendant KELSO as the Receiver appointed to oversee the administration, control, management, operation and financing of the CCHCS, has the authority to comply with any order made by this court authorizing injunctive relief to remedy Plaintiff's condition.  Defendant NASIR is liable for maintaining policies, customs, and practices which were the moving force of the constitutional deprivations Plaintiff has suffered.

18.     Defendant Dr. Theresa Currier ("CURRIER") is Plaintiff's current primary care physician ("PCP") at CSP-CAL.  As the Plaintiff's PCP, Defendant CURRIER, in conjunction with the powers vested in Defendant KELSO as the Receiver appointed to oversee the administration, control, management, operation and financing of the CCHCS, has the authority to comply with any order made by this court authorizing injunctive relief to remedy Plaintiff's condition. Defendant CURRIER is liable for maintaining policies, customs, and practices which were the moving force of the constitutional deprivations Plaintiff has suffered. Defendant CURRIER possesses all of Plaintiff's medical records and was, and is aware that a substantial risk of serious harm has existed to Plaintiff and the substantial risk has been obvious.

19.     Defendants DOES 1-10 reside in either Imperial or Sacramento County and are employed by CDCR or CCHS. These DOE defendants during all times relevant to the complaint were responsible for making the decisions concerning Plaintiff's treatment or non-treatment.  Each DOE defendant is sued in his/her individual and official capacities.

20.     The true names and capacities, whether individual, corporate, associate, governmental or otherwise of DOE Defendants herein are presently unknown to Plaintiff. Plaintiff will seek leave of the Court to amend this Complaint to show

7

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the true names and capacities of such Defendants if and when these are ascertained by Plaintiff.

21. Plaintiff is informed and believes, and thereon alleges, that each and every act or event was done, caused, suffered, allowed, or committed by Defendants, or by any of them, or was done, caused, suffered, allowed, and permitted by each and every Defendant, within the scope and course of his or her duties as the agent, principal, or partner, of each and every other Defendant.

## IV. FACTUAL ALLEGATIONS

22. Plaintiff is currently housed at Calipatria State Prison. His medical records reveal that when he was approximately 11 years old, he was diagnosed with narrowing of the left ureter and underwent reconstructive bladder surgery.

23. After his incarceration in 2010, Plaintiff went to USC for a surgical procedure on his left kidney. The surgery proved to be unsuccessful.

22. In February 2012, after becoming incarcerated in California State Prison, Holmes began to experience flank pain and recurrent urinary tract infections. He was referred for consultation and treatment to two urology specialists.

24. Mr. Holmes was first taken to an outside urologist, Dr. Fawcett, at Alvarado Hospital. Dr. Fawcett had to replace a surgical stent in his kidney which had become infected. Surgical stents are often used to dilate the kidney at the point of the obstruction to widen the area of obstruction or "stricture" and allow proper drainage to resume into the bladder. Surgical stents often become encrusted after about four months and they have to be monitored and surgically exchanged at regular intervals to avoid recurrence of obstructions at the site of the stent.

25. Alternatively, or in conjunction with a stent, a nephrostomy tube can be inserted onto the kidney above the obstruction to allow urine to drain directly from the kidney, through the tube, and then out of the body.

26.     On June 18, 2013 Dr. Fawcett recommended that Holmes not repeat a stent as was previously done, but rather, that he receive an "auto transplant." An "auto transplant" is a procedure which repositions the kidney inside the body in a way that restores proper pressure and allows urine in the kidney to drain properly into the bladder. Dr. Fawcett noted that his office was not equipped to perform such an operation and recommended "tertiary consultation for possible surgery." Holmes was then referred to the tertiary facility, Loma Linda University Hospital for further evaluation.

27.     On October 21, 2013, Dr. David Allen Hadley, a urologist from Loma Linda University, observed that Holmes had "a left ureteral stricture status post two repairs in the past with recent failure from 2011 at USC." Dr. Hadley recommended "a left percutaneous nephrostomy be performed followed by removal of the indwelling ureteral stent. Following this, imaging is to be performed to determine the exact location and length of the stricture and determine what further surgical intervention is indicated."

28.     On October 31, 2013, Dr. Hadley placed a nephrostomy tube in the left kidney. The purpose of this was to drain the kidney and bypass the obstruction in the ureter between the bladder and the kidney. It was also noted that the patient had "a mega ureter," that is, a dilated ureter from the point of the bladder to the area of the stricture above.

28.     In Holmes' case, Dr. Hadley ordered the nephrostomy tube to be placed until the patient could be further evaluated to decide what definitive surgery was necessary to correct the obstruction. In March 2014, Dr. Hadley was prepared to proceed with the surgery. After Dr. Hadley removed the nephrostomy tube, he was not certain of the exact location of the stricture nor its extent and he requested a second opinion at UCSD before proceeding with the surgery. When

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

subsequent testing revealed that the kidney was still obstructed, Dr. Hadley replaced the nephrostomy tube.

29. That same day, in the aftercare instructions given to Holmes, the interdisciplinary progress notes of May 9, 2014, detail Primary Care Provider, Dr. Estock's conversation with Plaintiff. She explained the damage that he would do to the kidney if he removed the nephrostomy tube including, but not limited to, *infection, loss of kidney function or kidney itself and/or death.* Thus, it is clear that Dr. Estock was well aware of the seriousness of Plaintiff's condition.

30. Dr. Hadley gave specific instructions on both May 27, 2014 and again on June 4, 2014 that the nephrostomy tube was not to be removed until a second opinion was obtained with regard to a definitive surgical procedure to treat the kidney.

In July of 2014, the area around Plaintiff's nephrostomy tube became infected. The nephrostomy tube allowed the obstructed or partially obstructed kidney to function and drain properly. Failure to maintain appropriate drainage with either a nephrostomy tube, ureteral stent or both could lead to chronic infection arising from the undrained urine and waste stored in the kidney.

31. In spite of Dr. Hadley's recommendation that the tube was to stay in place until another urologic opinion with regard to definitive care was done, the tube was nonetheless removed on July 14, 2014 and Plaintiff was then transferred to CSP-SAC the next day.

32. Rather than following the advice of Dr. Hadley and Dr. Fawcett, to arrange for a medical transfer to allow a surgical consult at UCSD, Defendant Estock allowed Plaintiff to be transferred to CSP-SAC and failed to arrange the recommended treatment. At a minimum, Dr. Estock should have arranged to have Mr. Holmes' nephrostomy tube replaced either before he was transferred or as soon as possible after his arrival at the new facility.

33. Eleven days after he arrived at CSP-SAC, on July 24, 2014, Mr. Holmes was interviewed by Dr. Estock as part of an inmate healthcare grievance appeal. Rather than arranging for appropriate and clearly medically necessary care, i.e. replacement of the nephrostomy tube at a minimum, Holmes' kidney drainage problem was not treated. By this time, he had developed a predictable kidney infection and was treated with antibiotics. He was not seen by an outside urologist expert for another two months after his transport to Folsom Prison despite the fact that the nephrostomy tube had still not been replaced.

34. Eventually on September 17, 2014, again on October 8, 2014, Plaintiff was taken to an outside urologist at the UC San Francisco Hospital (UCSF), Dr. Marshall Stoller, for his opinion on the treatment of Holmes condition. At this initial consult, UCSF concurred with Dr. Fawcett that "patient may need future auto transplant."

35. However, at a second consult three weeks later, UCSF suggested double voiding as treatment in lieu of a long-term surgical remedy. This proved to be ineffective and is reflected in PCP provider notes on November 19, 2014. PCP provider Dr. James Wedell wrote, "patient has complied with UCSF urology treatment recommendations. Zero help. No response to UCSF treatment suggestion and strongly recommend transfer to California State Prison near UCSD! ASAP!"

36. Plaintiff has had recurring urinary tract infections ever since with only temporary relief from recommended antibiotics and self-catheterization. This treatment was not effective and the antibiotics have become less effective and produced multiple antibiotic resistant organisms.

37. After all nonsurgical treatments recommended by Dr. Stoller at UCSF had failed, Plaintiff requested that he get another urology specialist opinion. His plea was denied. He repeatedly asked for a replacement of his nephrostomy tube

and/or further corrective surgery. Despite severe and chronic infection and pain, Holmes was informed that he was already advised by the doctors at Folsom Prison and health care providers at CCHCS that this was not deemed medically necessary.

38. From Holmes' last visit to UCSF on July 15, 2015 until October 6, 2016, Holmes did not see any specialist. Holmes was transferred back to CSP-CAL on July 15, 2016. Thereafter, repeated attempts were made to provide ongoing antibiotics to cure the persistent urinary tract infections. No medical progress could be discerned and the report on September 4, 2015 indicated that "his infection has shown multiple resistant strains to certain medications."

39. On October 6, 2016, Holmes received a telemedicine consult with Dr. Fawcett, the urologist, at Alvarado Hospital whom he had previously seen in 2013. Dr. Fawcett noted that prior recommendations to go to UC San Diego were not done and he again recommended, three years later, that Holmes be sent to the tertiary hospital UC San Diego, so he could receive the tertiary level of urologic care necessary to definitively correct the problem. This recommendation was again ignored.

40. Since 2016, Mr. Holmes has been treated for his kidney condition by another Dr. Dean Hadley who turns out to be Dr. David Hadley's uncle. Plaintiff's painful urinary tract infections have continued and he has not received a new nephrostomy tube, stent, or any other surgical intervention for his left kidney problem. Over the past two years, he has begun to experience pain in his right kidney which is not unusual when the left kidney is swollen and chronically infected. Unless Plaintiff's diseased left kidney is surgically repaired or removed, he remains at grave risk for renal failure.

///

///

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

41. Plaintiff has exhausted all available and necessary administrative remedies as required by 42 U.S.C. § 1997(e) and *Booth v. Churner*, 532 U.S. 731 (2001). Plaintiffs' administrative complaints were sufficient to put prison authorities on notice of the nature of wrong for which redress was sought.

42. On July 1, 2014, Plaintiff submitted a Patient-Inmate Health Care Appeal, Form No. CDCR 602 HC ("602"). He stated that he had "bad" pain in both of his kidneys and that his urine was cloudy. He believed that he had a kidney infection and requested that blood work be done. He notes that on June 4, 2014, he was seen by Dr. Hadley at Loma Linda Hospital who recommended a second opinion at UCSD. He writes that a transfer to CSP-SAC would "cause substantial harm to my health, and [he would have to] start over again with a new medical staff when [he is] in need of urgent medical attention."

43. Plaintiff was then transferred to CSP-SAC on July 15, 2014. The appeal was assigned to Dr. Estock who interviewed Plaintiff by phone on July 24, 2014. As Dr. Estock was well aware, both Dr. Hadley and Dr. Fawcett at Loma Linda, who had performed surgical procedures on Mr. Holmes' left kidney which proved to be unsuccessful in remedying his vesicoureteral reflux, the possible stricture in his left kidney and the stage 4 hydronephrosis in his left kidney, had recommended that Plaintiff be referred to UCSD for additional surgical repair of his left kidney. The appeal was denied on August 5, 2014 by Defendant Dr. Ball. Plaintiff was notified on August 6, 2014.

44. Plaintiff appealed the denial to California Correctional Health Care Services (CCHCS). On November 25, 2014, J. Lewis, the Deputy Director of Policy and Risk Management Services for CCHCS, denied the appeal and noted "this decision exhausts your administrative remedies."

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

45. On January 16, 2015, Plaintiff submitted a second Patient-Inmate Health Care Appeal, while still housed at CSP-SAC. He stated that his urine was backing up to his kidney from his bladder and he was in "very bad pain." He requested to be seen by a specialist in urology. The appeal was assigned to Dr. J. Ma. Plaintiff was interviewed on March 20 2015. The appeal was denied and Plaintiff was informed on April 1, 2015.

46. Plaintiff appealed the denial to CCHCS. On October 26, 2015, J. Lewis denied the appeal and stated "this decision exhausts your administrative remedies."

## VI. DEFENDANTS' ABILITY TO COMPLY WITH AN ORDER COMPELLING INJUNCTIVE RELIEF

47. CDCR has an established, robust, formal set of regulations and procedures for the transfer of inmates between correctional facilities, pursuant to Title 15, § 3379 of the California Code of Regulations.

48. CDCR "routinely transfers hundreds or thousands of inmates on a weekly basis" using these regulations and established procedures.

49. Defendants' procedures include provisions for voluntary and involuntary transfers.

48. Inmates can be transferred not only to other CDCR correctional facilities, but can also be transferred to out-of-state correctional facilities, or to federal facilities in California, under established CDCR transfer procedures. Title 15, § 3379(a)(6) and (a)(7).

49. The transfer procedure allows for temporary placement of inmates in facilities or levels for which they are not endorsed, due to medical conditions, and includes provisions for resolving any pending disciplinary issues prior to transfer. Title 15, § 3379(b) and (c).

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

50.     These provisions, in conjunction with the official powers vested by California law in Defendants KELSO, KERNAN, BROWN, MONTGOMERY, NASIR, BROWN, ESTOCK and CURRIER empower these defendants to comply with any order for injunctive relief which this court deems appropriate.

## VII.
## FIRST CLAIM FOR RELIEF
## VIOLATION OF THE EIGHTH AMENDMENT
## (42 U.S.C. 1983)

51.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs, as though set forth herein verbatim.

52.     Plaintiff maintains that the deprivations and violations of his constitutional rights were carried out pursuant to the rules, regulations, customs, policies, and practices of defendants in their official capacities, and that the named governmental defendants, acting under color of state law, caused plaintiff to be deprived of his constitutional rights.

53.     Plaintiff has an Eighth Amendment federally-protected right to be free from cruel and unusual punishment, a right secured by the United States Constitution, under 42 U.S.C. § 1983.

54.     Defendants acted under color of state law in that Defendants are state employees, operate the state prisons, and carry out the policies and practices described herein under the authority of California statute, regulation, and policy, to control Plaintiff's life, prison housing location, housing conditions, and medical care.

55.     The Eighth Amendment prohibits inhumane methods of punishment and inhumane conditions of confinement.

56.     When the State takes a person into its custody and holds him against his will, the Constitution imposes upon it a corresponding duty to assume a

responsibility for his safety and general well-being. When the State fails to provide for the needs of a confined individual, including medical care and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment.

57. An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

58. At all material times, the Defendants and DOES 1-10 were aware that Plaintiff had been diagnosed with damaged ureter, vesicouretral reflux, a possible stricture, and stage 4 hydronephrosis in his left kidney.

59. The actions of the Defendants and DOES 1-10 in denying Plaintiff necessary medical care was not based on a medical reason, but rather economic and/or other constitutionally impermissible reasons unrelated to the provision of medical services.

60. The Defendants and DOES 1-10 acted with deliberate indifference in hiring/retaining, training, and supervising employees such that they violated Plaintiff's constitutional rights.

61. Plaintiff's medical care providers breached their duties and violated numerous CDCR policies governing the provision of necessary medical care in failing to treat Plaintiff's condition. These failures were then ratified by policy-making level employees during the grievance process resulting in a further failure to treat Plaintiff's serious medical need and thereby deprive him of his constitutional rights.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. For the issuance of an injunction compelling Defendants to comply with the Eighth Amendment and provide Plaintiff with appropriate medical care for his ongoing kidney problem.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

B. For general, special and compensatory damages to be determined according to proof;

C. For an award of Plaintiffs' costs and attorneys' fees under 42 U.S.C. §1988, and,

D. For such other and further relief as the Court may deem just and proper.

Dated: July 3, 2018                    LAW OFFICES OF BRIAN A. VOGEL, PC

                                       By:    /s/
                                              BRIAN A. VOGEL
                                              Attorney for Plaintiff, , CHARLES
                                              HOLMES (AL-0671)

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: July 3, 2018                    LAW OFFICES OF BRIAN A. VOGEL, PC

                                       By:    /s/
                                              BRIAN A. VOGEL
                                              Attorney for Plaintiff, CHARLES
                                              HOLMES (AL-0671)

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF