1
2
3
4
5
6        **UNITED STATES DISTRICT COURT**

7        **SOUTHERN DISTRICT OF CALIFORNIA**

8

| | |
|---|---|
| 9   CHARLES HOLMES, | Case No. 16cv2458-MMA-BLM |
| 10                              Holmes, | **ORDER DENYING DEFENDANTS'** |
| 11   v. | **MOTION FOR SUMMARY** |
| 12   ESTOCK, et al., | **JUDGMENT** |
| 13                           Defendants. | [Doc. No. 96] |

14

15       Plaintiff Charles Holmes, a California inmate, brings this civil rights action

16   pursuant to 42 U.S.C. § 1983 alleging violations of his Eighth Amendment right to

17   adequate medical care.  Holmes, proceeding through counsel, filed a Third Amended

18   Complaint ("TAC") against Defendant Physicians Estock and Currier, whom he sues in

19   their individual capacities.  *See* Doc. No. 81.  Holmes also sues in their official capacities

20   Defendant Diaz, the Director of the California Department of Corrections and

21   Rehabilitation; Defendant Montgomery, the Warden of the institution where Holmes is

22   currently housed; and Defendant Nasir, the institution's Healthcare Chief Executive

23   Officer.  Holmes seeks damages and injunctive relief.  Defendants move for summary

24   judgment in their favor as to all claims.  *See* Doc. No. 96.  Holmes filed a response in

25   opposition, to which Defendants replied.  *See* Doc. Nos. 131-134, 142.  The Court took

26   the matter under submission without oral argument pursuant to Civil Local Rule 7.1.d.1

27   and Federal Rule of Civil Procedure 78(b).  For the reasons set forth below, the Court

28   **DENIES** Defendants' motion.

1

## BACKGROUND[1]

2
Holmes is a California inmate currently housed at Calipatria State Prison ("CAL")

3
in Calipatria, California.[2]  Holmes has a congenital defect in his left kidney requiring

4
ongoing medical treatment.  When he was approximately eleven years old, Holmes was

5
"diagnosed with narrowing of the left ureter and apparently had a bladder reconstructive

6
surgery."  PSS No. 1.1.  This treatment "lasted for over 20 years with no problems."  PSS

7
No. 1.3.

8
After Holmes was incarcerated in February 2012, he "began to experience

9
recurrent urinary tract infections."  PSS No. 3.2.  In May 2012, Holmes "underwent a

10
cystoscopy," which is a procedure to "examine the lining of the bladder and the urethra;"

11
there was also an "unsuccessful stent insertion."[3]  DSS No. 1.  Due to the failure of the

12

13

14
[1] These material facts are taken from Defendants' Separate Statement of Undisputed Facts (hereinafter

15
"DSS"), *see* Doc. No. 96-1, together with Defendants' supporting declarations and exhibits, as well as
Holmes' Separate Statement of Additional Facts (hereinafter "PSS"), *see* Doc. No. 134, together with

16
Holmes' supporting declarations and exhibits.  Particular material facts that are not recited in this section
may be discussed *infra*.  Facts that are immaterial for purposes of resolving the current motion are not

17
included in this recitation.

18
Defendants object to many of Holmes' proffered statements of fact on the ground of relevancy.  *See*

19
Doc. Nos. 142-1, 142-2.  However, "[o]bjections for relevance are generally unnecessary on summary
judgment because they are 'duplicative of the summary judgment standard itself.'"  *Sandoval v. County*

20
*of San Diego*, 985 F.3d 657, 2021 WL 116539, at *5 (9th Cir. 2021) (citing *Burch v. Regents of Univ. of*
*Cal.*, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006)).  As the Ninth Circuit recently stated in agreeing with

21
the findings in *Burch*, "parties briefing summary judgment motions would be better served to 'simply

22
*argue*' the import of the facts reflected in the evidence rather than expending time and resources
compiling laundry lists of relevancy objections.'"  *Id.* (emphasis in original).  Likewise, with respect to

23
Defendants' hearsay objections: "'At the summary judgment stage, we do not focus on the admissibility
of the evidence's form. We instead focus on the admissibility of its contents.'"  *Id*. (quoting *Fraser v.*

24
*Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)).  Accordingly, to the extent the Court finds a proffered

25
statement of fact material to the disposition of this matter, it overrules any relevancy or hearsay-based
objection to its admissibility.

26
[2] *See* CDCR Public Inmate Locator System, available at https://inmatelocator.cdcr.ca.gov/ (last visited

27
2/12/2021).

28
[3] "Surgical stents are often used to dilate the kidney at the point of the obstruction to widen the area of
obstruction or 'stricture' and allow proper drainage to resume into the bladder."  PSS No. 3.  "Without

stent insertion, Holmes had a "nephrostomy tube placed later that month."[4]  DSS No. 2. The tube was removed in August 2012 and a "left ureteral stent was placed."  DSS No. 3. Holmes underwent two more procedures in September 2012 and October 2012 that included removing and replacing his stent.  *See* DSS Nos. 4-5.

Dr. Fawcett, a urologist at Alvarado Hospital, began to treat Holmes in November 2012.[5]  PSS No. 7.  Dr. Fawcett "performed [a] ureteral stent exchange" on February 6, 2013.  PSS No. 7.1  Dr. Fawcett noted that Holmes "had a urological infection that was not easily eliminated."  DSS No. 7.  However, a renal scan "showed good function of both kidneys."  PSS No. 7.1.  Dr. Fawcett determined that Holmes could either "live as is, have his kidney removed, or attempt another ureter repair."  DSS No. 8.  However, Dr. Fawcett determined after reviewing Holmes' medical records that "it appears that he has already had the operation done that I would have considered doing."  DSS No. 9.

Holmes "returned to Alvarado Hospital for a surgery stent exchange" on April 6, 2013.[6]  PSS No. 8.1.  On June 18, 2013, Holmes had a consultation with Dr. Fawcett who "recommended tertiary consultation for possible auto transplant surgery."[7]  PSS No. 8.2;

---

proper drainage, the kidney will become enlarged and infected, and over time, it will lose function and eventually fail."  PSS No. 3.2.

[4] "The purpose of the nephrostomy (and/or the stent) is to allow the kidney to function and drain properly in the face of total or partial obstruction and failure to do so would leave inevitably to chronic infection and eventual renal failure."  PSS No. 29.1.

[5] As detailed *infra*, Holmes has been treated and/or examined by numerous physicians throughout his period of incarceration, including Dr. Fawcett.  However, Drs. Estock and Currier are the only medical professionals defending against this action.

[6] "Surgical stents often become encrusted after about four months and they have to be monitored and surgically exchanged."  PSS No. 7.2.

[7] A "tertiary facility" is "generally understood to mean a hospital that provides highly specialized care often involving advanced and complex procedures and treatments in state-of-the-art facilities, such as academic medical centers."  DSS No. 11.  An auto transplant removes the blocked kidney and "replaces it down in the pelvis to overcome the area of the diseased ureter, the tube that goes from the kidney to the bladder."  PSS No. 8.3.

*see also* DSS No. 10.  Dr. Fawcett "recommended that Holmes not repeat a stent as was previously done, but rather that he receive an auto transplant or other surgical remedy that was more permanent, and which had not been suggested before, to avoid any future problems."  PSS No. 9.1.  Holmes was "referred to the tertiary Loma Linda University Hospital for further evaluation."  PSS No. 10.1.

Meanwhile, Holmes' "Medical Classification Chrono ("MCC") was updated to indicate that tertiary consultations were required."  DSS No. 12.  Checking the "tertiary consultations box" on the MCC form indicates that "an inmate needs to be housed at an institution near a large metropolitan area that would be closer to tertiary medical centers."  DSS No. 14.

On August 24, 2013, Holmes was admitted to Alvarado Hospital for "hematuria & pain."  PSS No. 15.1.  Dr. Fawcett examined Holmes and noted that Holmes' last stent was in February, more than six months prior to his August admittance.  *See id*.  Dr. Fawcett also noted that the "stent was slightly encrusted" and, as such, the stent was replaced four days later.  PSS No. 15.1; *see also* DSS No. 15.

In October 2013, Dr. David Hadley, a urologist at Loma Linda University Health System, examined Holmes and then "detailed [Holmes'] 'very complicated problem.'"  DSS No. 16; *see also* PSS No. 16.  On October 29, 2013, "Dr. Hadley inserted a nephrostomy tube" into Holmes.  DSS No. 17; *see* also PSS No. 17.  The following month, Dr. Hadley removed Holmes' stent but "left the tube in place."  DSS No. 18.

In December 2013, Holmes "underwent a CT scan of his abdomen and pelvis and a nephrostogram stent loop gram (a fluoroscopic study)."  DSS No. 19.  A "temporary medical hold," which is a direction to prison staff to "not transfer an inmate during a specific time period due to an ongoing medical condition or treatment," was documented on Holmes' MCC form on December 31, 2013.  DSS Nos. 20-21.

In January 2014, Holmes "complained of abdominal pain with possible tube blockage and was transported to the hospital."  DSS No. 22.  Holmes returned to Loma Linda for a "nephrostomy tube exchange" but his "nephrostogram . . . suggested ureteral

patency, so the decision was made to remove his nephrostomy tube." DSS No. 23. According to Holmes, Dr. Hadley "removed the tube in preparation for reparative surgery." PSS No. 22. The following day, Holmes "complained of difficulty urinating and was transported to the hospital and discharged the same day." DSS No. 24; *see also* PSS No. 24.

"After a February 7, 2014 test showed a partial obstruction of his left kidney," Holmes' MCC form was "updated to reflect a temporary medical hold for 'left ureteral stricture – may get surgery.'" DSS No. 25.

Dr. Hadley examined Holmes on February 13, 2014, "with the plan, 'will schedule surgery.'" DSS No. 26. On March 20, 2014, Dr. Hadley examined Holmes again; Dr. Hadley had planned to "perform a reconstructive surgery but performed a cystoscopy prior to surgery and documented 'no stricture identified in left ureter, open revision [surgery] not currently indicated.'" DSS No. 27. According to Holmes, Dr. Hadley was "prepared to proceed with the surgery" but "requested a second opinion before proceeding with the surgery." PSS No. 27.

Holmes had a new stent placed on March 20, 2014, and then removed on April 15, 2014. *See* DSS No. 28. During that timeframe, Holmes "complained of flank pain and was sent to the emergency room and discharged the same day." DSS No. 29.

In May 2014, Defendant Dr. Estock became Holmes' primary care physician. DSS No. 30. According to Holmes, he told nurses that Dr. Estock "would just come in and sign the books, the logs instead of personally coming to see me." PSS No. 30.

On May 9, 2014, Dr. Hadley placed another nephrostomy tube "when subsequent testing revealed that the kidney was still obstructed." PSS No. 31; *see also* DSS No. 31. According to Holmes, Dr. Hadley "solved the immediate problem with the stent and/or the nephrostomy tube, but appreciated that this was not a final solution, and he requested a second opinion or wanted a second opinion." PSS No. 31.1. Dr. Hadley gave instructions to flush the tube "every 12 hours" and to change the dressing every three

days "and as needed."[8]  DSS No. 32.  Because this "required a level of nursing care" beyond what could be done in general population,  Dr. Estock "wrote orders for [Holmes] to be admitted to the Outpatient Housing Unit ("OHU")" and directed that Dr. Hadley's orders be followed.  DSS No. 33.

While housed in the OHU, Holmes was to be "seen by a member of the nursing staff three times a day and visited with a physician approximately every 14 days."  DSS No. 34.  However, when Holmes was informed that he was going to be admitted to the OHU, he "stated he did not want to go to OHU," "verbalized that he was going to refuse all medical treatment," and indicated he "would remove the nephrostomy tube as soon as he could."  DSS Nos. 35-37.  According to Holmes, he made that statement because the "only way he could 'get them doctors to talk to me,' to get medical attention or appointment with his PCP was to refuse treatment."  PSS No. 37.2.  Holmes claims he did not "want to go back there" until he could speak with Dr. Estock.  PSS No. 36.  Holmes "refused to participate in the admissions assessment."  DSS No. 38.

On May 10, 2014, "the nursing records note that [Holmes] was refusing all medications and tube flushings."  DSS No. 39.  Holmes claims that he did not "refuse all flushings."  PSS No. 39.  Rather, he refused the flushing of his tube on certain occasions "when it was a nurse who got the tube kinked up and he wanted to wait for the next watch a few hours later."  Id.  "Records note that Holmes regularly had the tube flushed after it was reinserted on May 9, 2014."  PSS No. 39.1.  When Holmes did refuse on approximately ten occasions to have his tube flushed, it was because he was in pain or he was "trying to get the attention of the doctors."  PSS No. 39.2.

According to Holmes, he was "initially conflicted regarding leaving the tube in" but after being informed by Dr. Estock that removing it could lead to the "loss of kidney or kidney function" and possibly death, he reluctantly agreed to leave it in.  PSS No.

---

[8] According to Holmes, rather than changing the dressing every seventy-two (72) hours, which was the order given by Dr. Hadley, it should have been changed every four hours.  See PSS 32.1.

36.1.  When Dr. Estock visited Holmes on May 10, 2014, she noted that Holmes agreed to leave the tube in place but "refuse[d] nursing irrigation because 'that caused [him] problems before.'"  DSS No. 40.  Dr. Estock saw Holmes two days later and told him that she had "left a message with Dr. Hadley to clarify the duration of the tube flushing, which [Holmes] was continuing to refuse."  DSS No. 42.

On May 27, 2014, Dr. Hadley "recommended and performed a voiding cysto urethrogram ("VCUG") which showed reflux but no obstruction" and recommended that Holmes receive a second opinion from UCSD before proceeding with surgery.  PSS No. 45; *see also* DSS No. 43.  Dr. Hadley wrote in his notes that he was "uncomfortable offering the patient any type of reconstruction [surgery] as it is unclear where his pain is arising from."  DSS No. 43.  Dr. Hadley "recommended a 2nd opinion (they also have contract with UCSD)" and noted that he would "continue nephrostomy until [Holmes] can consult" with another physician.  *Id*.  According to Defendants, the California Department of Corrections and Rehabilitation ("CDCR") "did not contract with UCSD in 2014."[9]  DSS No. 44.

On May 31, 2014, Holmes "complained to a supervisor that he had not seen a doctor since he returned from his May 27 visit" with Dr. Hadley and he "wanted a urinalysis completed."  DSS No. 45.  A supervisor informed Holmes that he had been seen by Dr. Kim on May 27, 2014 when he returned from his visit with Dr. Hadley and he would have a follow up appointment with his primary care physician in fourteen days.  *See* DSS No. 46.  The supervisor also noted that Dr. Estock had written orders for Holmes to have a urinalysis done.  *See* DSS No. 47.

According to Holmes, he would refuse medication for various reasons including the fact that he was allergic to certain medication, some medication for pain was

---

[9] However, according to Holmes, in 2014 "CDCR was able to contract medical services from UCSD through a letter of agreement ("LOA") 'special needs' contract" or California Penal Code § 5023.5.  PSS No. 44.

ineffective, and concern that he would become resistant to antibiotics.  *See* PSS No. 50. On June 9, 2014, Dr. Kim noted that Dr. Hadley "recommends Holmes is to [be] seen by another tertiary institution" and they would "continue the use of Tylenol 3 for pain."  PSS No. 51.  However, it was not until "six weeks later, on [July 10, 2014]," after the notation by Dr. Kim, that Dr. Estock put the request for second opinion in the "Primary Care Provider log."  PSS No. 54.  She also gave instructions that the tube should not be removed until Holmes received the second opinion regarding surgery.  *See id*.

On June 18, 2014, Dr. Hjerpe "noted that per Dr. Hadley, nephrostomy tube not for long term use (can be kept in temporarily pending second opinion), #2 no indication for chronic stenting, #3 no clear indication for any operative intervention, #4 he is recommending second opinion."  DSS No. 54.  While waiting for the second opinion, "[n]umerous requests were recorded from Holmes asking to see his PCP, Dr Estock, because he was experiencing pain and discomfort."  PSS No. 55.  Meanwhile, Dr. Estock updated Holmes' MCC form on June 27, 2014 to remove the temporary medical hold while "maintaining the requirement for tertiary consultations that contracted with CDCR."  DSS No. 55.

On July 1, 2014, a nurse noted in Holmes' medical records: "Dr. Estock notified of [patient] request to speak to her regarding his chronic left nephrostomy pain" but "[p]er Dr. Estock – not until scheduled."  PSS No. 46.1; *see also* PSS No. 65.2.  According to Holmes, he kept asking the nurses "when [will] I be able [see] the doctors" as his tube area "wasn't getting cleaned."  PSS No. 46.2.  Holmes claims he was not able to see Dr. Estock even though she would examine other patients.  *See id*.

Holmes was examined by Dr. Estock on July 2, 2014, but she did not "note any concerns with the appearance of the nephrostomy tube site."  PSS No. 57.

According to Holmes, Dr. Estock had no "medical appointments with [Holmes] from July 2, 2014 until after he returned to Calipatria State Prison in July 2016,"  PSS No. 59.2, even though he made "[n]umerous requests" to see Dr. Estock because he was "experiencing pain and discomfort."  PSS No. 60.1.  Holmes claims that nurses would not

clean the area around the tube without an order from Dr. Estock, but no such order was ever written by Dr. Estock.  *See id*.  "Proper cleaning of the tube itself and the skin surrounding the tube is extremely important in order to avoid infection."  *Id*.  A nurse noted "patient threatens to pull nephrostomy tube out in AM if PCP doesn't come talk to him, PCP notified."  PSS No. 60.2.  No new orders were written, and no antibiotics were prescribed.  *See id*.

On July 8, 2014, Holmes stated "I want [the nephrostomy tube] taken out."  DSS No. 59.  The nurse who changed Holmes' dressing noted "no signs or symptoms of infection at the nephrostomy tube site."  DSS No. 60.  The nurse further noted that "patient reports dysuria (blood in urine)" and to "[m]onitor for now as per urology recommendation."  PSS No. 59.1.  It was also noted that "[i]nfection at risk for systemic alteration in comfort/pain to L. nephrostomy."  PSS No. 60.

On July 10, 2014, a nurse noted, after observing a "problem with [the] tube," that the primary care physician "would 'investigate need for replacing tube, but that nephrostomy tube will remain.'"  PSS No. 60.3.  Holmes was advised that he may be transferred to see a specialist and he was prescribed Tylenol 3 "for pain management."  PSS No. 60.3.  A second nurse noted Holmes was "at risk for renal infection" and observed "redness and swelling at tube insertion site (but) patient calm and cooperative."  PSS No. 60.3.  According to Holmes, "[n]urse records on July 10, 2014 show an unchecked box indicating that cleaning/dressing change was not done on that date."  PSS No. 33.  Holmes claims nurses told him that Dr. Estock had not written orders for them to clean the skin area around his nephrostomy tube.  *See* PSS No. 34.  Dr. Estock did not examine Holmes that day.  *See* PSS No. 60.3.

According to Holmes, from June 30, 2014 to July 13, 2014, "dressing changes did not happen within the 72 hours" ordered by Dr. Hadley.  PSS No. 62.2.

On July 11, 2014, Holmes "complained to a nurse that his nephrostomy bag was leaking," but after the nurse and a supervisor examined the bag, they found it to be "without leaks."  DSS Nos. 65-66.  Later that day, they discovered the "nephrostomy bag

was missing" and it was documented that Holmes admitted he "threw it away . . .." DSS No. 67-68. Initially, medical personnel could not replace the bag because they did not have any "in stock." DSS No. 69. It was noted that several other prisons, along with local hospitals, were contacted but none had any nephrostomy bags. *See* PSS No. 68.2.

On July 12, 2014, the nurse noted "alteration in comfort/pain at nephrostomy tube insertion" and wrote "[p]atient stating a pain level 9/10 at nephrostomy site." PSS No. 63.6; *see also* PSS No. 68.5. Holmes received a new nephrostomy bag the next day. *See* DSS No. 71.

On July 14, 2014, a "foul smelling pus was noted to be coming from [Holmes'] nephrostomy site and Dr. Kim diagnosed [Holmes] with cellulitis/abscess (bacterial skin infection/mass containing pus, bacteria, and debris) and ordered antibiotics and transfer to the hospital 'for nephrostomy tube removal.'" DSS No. 72; *see also* PSS No. 71. At this point, Holmes claims he had gone multiple days, in excess of the seventy-two hours ordered by Dr. Hadley, without have his dressing changed. *See* PSS No. 63. Holmes had "been asking to speak to Dr. Estock because nobody was doing my dressing." PSS No. 63.4.

Holmes was taken to the emergency room at Pioneer Memorial Hospital ("PMH") that same day. *See* PSS No. 62.6. Dr. Kim "sent over order[s] to remove the nephrostomy tube, rather than replace it." *Id*. However, according to Holmes, Dr. Hadley "recommended the tube not be removed." PSS No. 62.7. Holmes' nephrostomy tube was removed. *See* DSS No. 73. According to Holmes, this was done "[i]n spite of Dr. Hadley's recommendation that the tube was to stay in place until another urologic opinion with regard to definitive care was done" and "without consultation of a urologist, without nephrostomy tube replacement, and against the advice of Dr. Hadley." PSS No. 55.

Holmes was transferred from CAL to California State Prison, Sacramento ("CSP-SAC") the next day. DSS No. 77. While Dr. Estock "claims she played no role" in the decision to transfer Holmes, she was aware it was happening. PSS No. 64.4.

According to Holmes, Dr. Estock had been aware of the orders by Dr. Kim to remove his nephrostomy tube, but she "did not put in the transfer notes to replace it." PSS No. 62.7.  Additionally, "[t]he 'needs immediate attention' box on the [CDCR] transfer information form of [July 15, 2014] was left unchecked."  PSS No. 77.6.  According to Holmes, when he arrived at his new prison he was not "seen by the PCP doctor for 14 days."  PSS No. 64.3.  As a result, Holmes "developed a predictable kidney infection."  *Id*.  In addition, Holmes was "not seen by an outside urologist expert for another two months after his transport . . . in spite of the fact that the nephrostomy tube had still not been replaced."  *Id*.

According to Defendants, Holmes "refused his first medical appointment at [CSP-SAC] on July 18, 2014."  DSS No. 78.  However, Holmes maintains that he "didn't refuse" but rather "[t]hey never came to get [him]."  PSS No. 78.

On July 22, 2014, Holmes was examined by Dr. Ma, who noted Holmes' "complicated urological history" and indicated that he would "write a request for services for him to get a urology consultation for a second opinion."  DSS No. 79.  Dr. Ma also wrote that Holmes "needs to go to either UC Davis or UCSF [University of California, San Francisco] for second opinion" within "three weeks or sooner."  DSS Nos. 79-80.  According to Holmes, although Dr. Ma prepared an "assessment report," it contained no "notes on the chronic care intake document instructing Dr. Ma to reinsert nephrostomy tube and there was no indication of instructions from Dr. Estock (PCP) or Calipatria care team for this to be done," PSS No. 79, despite the fact that the primary care physician "is responsible for continuity of care when [a] patient is transferred."  PSS No. 79.2.

Holmes was "not seen by an outside urologist expert for another two months after his transport to CSP-SAC in spite of the fact that the nephrostomy tube had not been replaced."  PSS No. 80.

On September 17, 2014, Holmes "visited with Dr. Stoller of UCSF Department of Urology, who reviewed [Holmes's] history, examined [Holmes], and requested further studies."  DSS No. 81.  Dr. Stoller noted that at the initial consult "UCSF concurs that

'patient may need future auto-transplant.'" PSS No. 81.  He further noted that he "addressed his left ureteral stricture with the patient" and found it is a "new problem for us" and the "issue is getting worse."  PSS No. 81.2.

On October 8, 2014, Holmes was examined by Dr. Stoller again for a "history, exam, cystoscopy and renogram."  DSS No. 82.  Dr. Stoller opined that Holmes "may need to get an auto transplant in the future" and recommended that Holmes "use timed and double voiding to ensure proper bladder emptying."  DSS No. 83.  According to Holmes, it appears Dr. Stoller decided to recommend "double voiding . . . as treatment in lieu of long-term surgical remedy."  PSS No. 83.  Dr. Wedell, Holmes' primary care physician at the time, noted on November 19, 2014 that Holmes "complied with UCSF urology treatment recommendations.  Zero help."  *Id*.  He further noted "[n]o response to UCSF treatment suggestion and strongly recommend transfer California State Prison near UCSD!  ASAP!"  PSS No. 83.  Dr. Wedell further indicated "pain, lightheadedness, UTI, bilateral cystitis (bladder infection), patulous left ureter & severe hydronephrosis (swelling of kidney)" along with "[c]omplaints of right kidney pain, dysuria and chills."  PSS No. 84.2.

Holmes' "infection persisted between July 15, 2014 and July 15, 2015" and he "continued to submit dozens of complaints throughout 2014."  PSS No. 83.1.

On January 9, 2015, Dr. Wedell noted that Holmes was not "responding to time double voided and intermittent self-catheterizing . . . with persistent flank pain."  PSS No. 86.  Dr. Wedell went on to note that if Holmes was still "co+, [Holmes] deserves to return to UCSF or transfer to UCSD."  PSS No. 86.3.

On February 9, 2015, Holmes reported that he was "having very bad pain now on both [his] kidneys and burns when [he] urinat[es]."  PSS No. 86.3a.

On March 3, 2015, Dr. Ma examined Holmes and "informed him that the urologist from UCSF was firm about the fact that there was no indication of a surgical intervention."  DSS No. 86.  Dr. Stoller examined Holmes on July 15, 2015 and recommended "clean intermittent catheterization every 3 hours;" he did not "think there

are surgical options available to [Holmes] that would improve his current situation."
DSS No. 87.  "By July [] 2015, the final UCSF reports show the kidney continuing to
decline without an effective method of draining."  PSS No. 84.3.

From Holmes' last visit at UCSF on July 15, 2015 until October 6, 2016, "Holmes
did not see any specialist."  PSS No. 87.4.

Sometime in July 2016, Holmes was transferred back to CAL and on July 9, 2016,
he was "seen by a nurse practitioner."  DSS No. 89.  The nurse practitioner "documented
that [Holmes] had a methadone prescription but was not taking it and wanted Tylenol 3,
an opioid instead."  *Id*.  Holmes was "sent to OHU."  PSS No. 89.1.  Notes indicate that
Holmes was "on methadone, was placed in OHU to tape[r] off methadone."  PSS No. 89.
According to Holmes, he was told the only way he could leave OHU was to sign a paper
that he refused methadone, but it was with the expectation he would receive Tylenol 3 as
a replacement for pain medication; he received no pain medication.  *See* PSS No. 89.1.

On July 12, 2016, a "urological consultation was ordered."  DSS No. 93.  On July
14, 2016, Defendant Dr. Currier examined Holmes "as a new patient in her role as his
[primary care physician]."  DSS No. 94.  During this visit, Holmes "presented with pain
during urination and bacteria in his urine" and Dr. Currier "prescribed an antibiotic."  *Id*.
Dr. Currier noted in Holmes' medical record: "left kidney obstruction with no stent, stent
removal, nephrostomy tubes, chronic UTI's – 2 days, dysuria and flank pain."  PSS No.
89.2.  Holmes asked Dr. Currier for Tylenol 3 instead of methadone.  *See id*.  It was noted
that "PCP contacted via telephone call and no new orders received."  PSS No. 89.4.
Holmes advised Dr. Currier that his "pain [is] not relieved with regular strength Tylenol."
PSS No. 94.2.

According to Holmes, he continued to ask for pain medication for approximately
two years from Dr. Currier "but all that time, she never prescribed any medication, no
nothing for me, I'm just in pain."  PSS Nos. 89.5 – 89.6.  Dr. Currier "believed [Holmes]
was exhibiting drug seeking behavior" and prescribed him "regular Tylenol for his pain."
DSS Nos. 95-96.  On July 11, 2016, Dr. Currier "places [sic] order to stop methadone and

replace with regular Tylenol."  PSS No. 94.1.

On July 14, 2016, Dr. Currier examined Holmes, who complained of pain on both sides of his back "because of kidneys."  PSS No. 94.4.  Holmes requested Tylenol 3, but Dr. Currier denied his request; she prescribed Tylenol PM instead.  PSS No. 94.4.  Dr. Currier's notes indicated "[t]ried to discuss with patient the plan to follow Dr. Stoller's UCSF plan" but "[p]atient did not want to discuss."  PSS No. 94.6.

In August 2016, Dr. Currier "requested that [Holmes] be sent to a urologist."  DSS No. 97.  On September 7, 2016, Dr. Currier reviewed Holmes' medical records from UCSF which contained the recommendation by Dr. Stoller that "when [Holmes] had urinalysis showing bacteria, his providers should 'only treat when patient has a UTI, which is defined as fever, flank pain, hematuria [blood in urine], plus bacteria in the urine."  DSS No. 99.  Based on this recommendation, Dr. Currier "stopped prescribing antibiotics to [Holmes] whenever his urine showed bacteria, but he did not have a fever, flank pain, and hematuria."  DSS No. 100.

On September 13, 2016, Holmes "walk[ed]-in with complaints of stomach pain, kidney pain and lightheadedness" and "stat[ed] he has had diarrhea 3 times or more today."  PSS No. 98.6.  Holmes also had "painful urination and discomfort overall" and "flank pain."  *Id*.  Three days later, Holmes complained of "having very bad pain in both sides of [his] kidney and it hurts when [he] urinates."  PSS No. 98.5

Holmes' request for pain medication ultimately went before the "Pain Management Committee."  PSS No. 101.2.  The Committee members "discussed that [Holmes] was seeking pain medication, such as morphine and Tramadol, and they recommended urology follow-up, self-catherization, and 'formulary non-opiate pain prescriptions for as needed use.'"  DSS No. 101.  According to Holmes, the self-catherization was a recommendation made more than a year prior and s the CSP-SAC "in house doctors" noted that the self-catherization was "not working."  PSS No. 101.  It was also well documented that Holmes was allergic to Ibuprofen and regular Tylenol was "not effective for Holmes' pain."  PSS Nos. 6.1, 101.2.

Dr. Currier informed Holmes that the committee recommended that he be prescribed "anti-depressants." PSS No. 102. Holmes said he would accept a prescription for any medication "as long as it wasn't psych med." *Id*. Holmes was concerned about the side effects of this type of medication because he had "never in his whole life [taken] no psychiatric medications, no anti-depressants." PSS No. 102.1. Dr. Currier informed Holmes that she "couldn't give him information on the side effects because 'she said she wasn't a psychiatrist.'" *Id*. Holmes requested the names of the medications so he could have "someone in his family research them." PSS No. 102.2. After learning of the side effects of this medications, Holmes "didn't want to take none of that stuff." PSS No. 102.3. As a result of refusing to take the psychiatric medication, Holmes was not given any pain medication. *See* PSS No. 102.4.

Dr. Currier noted on September 16, 2016 "[n]o new meds ordered" and to "[f]ollow up in 3 months with PCP for chronic back pain and chronic bacteria." PSS No. 102.8. Dr. Currier documented several days later that Holmes "doesn't want to try alternatives to narcotics and refused Tylenol or formulary choices other than narcotics or opiates." DSS No. 104.

On October 6, 2016, Holmes had a tele-med consultation with Dr. Fawcett who "recommended that [Holmes] be sent to UCSD for definitive treatment." PSS No. 97. Dr. Fawcett also confirmed that Holmes "continues to have urinary tract infections (UTI)," is "feverish and off balance," and reported "left flank pain." *Id*. Dr. Fawcett noted: "Consultation at UC San Diego is also recommended" as they "would be better able to manage this difficult case." PSS No. 105.2. Dr. Fawcett also reported that prior urologists "requested [Holmes] go on to UC San Diego for a second opinion" but "that was not done" and instead, "[h]e was transferred to another prison." PSS No. 105.6. On October 11, 2016 "this report was stamped T. Currier, signifying she was aware of the report and its contents." *Id*.

Dr. Currier saw Holmes on October 17, 2016, "reviewed Dr. Fawcett's recommendations, which were 'don't treat [bacteria in the urine] unless clinically

appropriate,'" and "attempted to recommend that [Holmes] try formulary non-opiate pain medications, which he declined." DSS Nos. 106-107.

On December 7, 2016, Holmes submitted a health services request indicating that he was "hurting on [his] sides when urinating" and he was suffering from "sharp" pain as a result. PSS No. 106.2. Holmes sent a second request the following day stating he had "unbearable pain in both [of his] kidneys due to UTI infection" and it burned when he urinated. PSS No. 106.3. The nurse notes from that day indicate that Holmes had requested "pain medication that is stronger than Tylenol" which was "discussed with PCP." PSS No. 106.5. The notes also state: "Called UMRN" regarding a "request for services for tertiary, urology consultation, referred to offsite specialty." *Id*. "PCP notified and [patient] referred." *Id*.

The following day Holmes again reported that he was "having very bad pain in both my kidneys due to UTI infection." PSS No. 106.6. On December 12, 2016, Holmes again reported that "Tylenol [was] not working" and he was in "very bad pain," causing him to be unable to sleep and "move around due to the pain." PSS No. 106.7. The nurse noted: "[C]urrent [prescription] helps very little, discuss with Dr. Currier during huddle." *Id*.

On December 13, 2016, Holmes wrote again in a health services request that he was experiencing "very bad pain" and "lost sleep due to [his] UTI infection." *Id*. Holmes was seen by Dr. Currier the following day on December 14, 2016. *See id*. Dr. Currier "prescribed non-pain medication" that she read about in a "Mayo Clinic article." PSS No. 108. Dr. Currier prepared a request for services in which she wrote: "See dictated report by Dr. Fawcett urologist from 10/6/16." PSS No. 110.1.

On December 19, 2016, Holmes was examined by Dr. Dean Hadley, who wrote a "problem list" that consisted of the same problems suffered by Holmes as identified by Dr. David Hadley approximately two and a half years earlier. PSS No. 110.2. Dr. Hadley diagnosed Holmes with "stricture of left ureter – primary hydronephrosis, unspecified hydronephrosis type, secondary left vesicoureteral reflux, intermittent self-

catheterization of bladder."  PSS No. 110.2.  Dr. Hadley "recommended an ultrasound, cystoscopy, and possibly a VCUG, and Dr. Currier requested that [Holmes] undergo these procedures."  DSS No. 110.

Holmes was seen one year later by Dr. Hadley, who wrote: "Last visit we collection urine and sent it with this sentence: **PLEASE culture the aspirate sent with him as he has had resistant organisms in the past.**  We do not have the results."  PSS No. 118 (emphasis in original).  However, "[n]o follow up with Dean Alan Hadley of Loma Linda was scheduled to treat Holmes' problem."  PSS No. 120.

In January 2017, Holmes underwent a "retrograde urethrogram at Loma Linda," which was requested by Dr. Currier.  DSS No. 111.

On February 21, 2017, Dr. Currier "ordered Tylenol 3 for acute pain after he underwent a retrograde urethrogram."  DSS No. 112.  She ordered Tylenol 3 "for three days after a medical procedure" on March 27, 2017.  DSS No. 113.

In April 2017, Dr. Hadley performed a "cystoscopy" on Holmes; a "lesion was found on his bladder wall."  DSS No. 114.

On August 17, 2017, Holmes had another cystoscopy and "biopsy of the bladder," pursuant to Dr. Currier's May 1, 2017 orders.  DSS No. 116.  Dr. Currier "ordered Tylenol 3 for before and after the bladder biopsy procedure."  *Id*.

Holmes had another cystoscopy in December 2017, performed by Dr. Hadley, who prescribed a "few days of antibiotics but no pain medication."  DSS No. 118.

Dr. Currier saw Holmes "for his last [primary care] visit on June 11, 2018;" Dr. Currier "reviewed the recommendation of [Dr. Dean Hadley] that medical providers were instructed to 'not treat patient for UTI with antibiotics if his only complaint is flank pain/dysuria without fever.'"  DSS No. 120.

In July 2018, Holmes was sent to the Administrative Segregation Unit ("ASU"); Holmes claims that he was supposed to be housed in the OSU where Dr. Estock and Dr. Currier were assigned but "because of the situation going on with this [law]suit" they placed him in Ad-Seg.  PSS No. 125.2.  According to Holmes, his nephrostomy tube was

not treated by medical staff but instead "psych techs," one of whom caused his tube to be "clogged up for eight hours" because he did not clean it properly." PSS Nos. 125.4, 125.5.

Holmes developed an infection and fever as a result of the problem with his tube. *See* PSS No. 125.6. A call was made to CAL's medical clinic where Dr. Currier was the on-call doctor. *See id*. Dr. Currier was aware that Holmes' tube was "kinked up from 8:00 o'clock to 6:00 o'clock" and he was "experiencing severe pain." *Id*. Dr. Currier ordered a dose of Tylenol 3 for Holmes and told him to "come back the next morning to the . . . central medical and see how [he] was doing." *Id*. When Holmes returned the next day, he did not see Dr. Currier, instead he was seen by the nurse. *See* PSS No. 125.8.

On August 10, 2018, Holmes was "taken in a state vehicle to local Pioneers Memorial Healthcare for 'left flank pain.'" PSS No. 120.1. While at Pioneers Memorial, Holmes was "diagnosed with pyelonephritis" which is commonly known as a kidney infection. *Id*. The discharge notes also indicated that "[p]atient will ultimately require follow up to urology consultation for possible nephrostomy tube placement for persistent symptoms and progressive stricture/ureteral stenosis." PSS No. 120.2.

Holmes had a follow up appointment scheduled with the urologist at Loma Linda on August 16, 2018 but it was "cancelled due to no letter of agreement." PSS No. 121. Instead "[h]igher-ups have told us to send him to UCSD instead." *Id*.

Approximately two years after Holmes filed this action, "Dr. Jill Buckley of UCSD was 'contracted' to do a urology eval[uation] (and eventual treatment) of Charles Holmes for the date of [September 4, 2018]." PSS No. 121.2. On September 4, 2018, Dr. Jill Buckley examined Holmes at UCSD; her notes indicate that he had "left flank pain and urological issues."[10] DSS No. 121. Dr. Buckley  "recommended a nephrostomy tube and

---

[10] CDCR has contracted with UCSD for the provision of health care services from May 2018 to the present. *See* DSS No. 122.

labs but no opioids." DSS No. 123. On September 10, 2018, Holmes had a renal scan at UCSD. *See* DSS No. 124.

On or about October 2, 2018, Dr. Buckley replaced the nephrostomy tube that had been removed approximately four years prior and noted in her "inpatient chart report" that the plan was for a "routine nephrostomy exchange in 8-12 weeks." PSS No. 125. Holmes was also seen by Dr. Fuller for a "nephrostogram to evaluate the condition of the kidneys." DSS No. 126.

On October 20, 2018, Holmes "complained of flank pain, and Dr. Currier who was on call, prescribed Tylenol 3 after a nurse found a kink in his tube." DSS No. 127. That same day, Dr. Buckley examined Holmes at UCSD while he was there for a "antegrade nephrostogram to evaluate for obstruction." PSS No. 126.1. Dr. Buckley noted that Holmes' "pain improved after nephrostomy drainage" following the previous placement of the nephrostomy tube. *Id*. It was further noted "no current facility medications on file prior to visit." *Id*.

On October 31, 2018, Holmes was "transported to the emergency room for flank pain and a loose suture at the nephrostomy, but there was no evidence of any acute abnormality." DSS No. 128. Holmes was admitted to the hospital because a "suture of nephrostomy got loose" causing his tube to "come about a bit." PSS No. 128. The notes in Holmes' chart indicated "no hydronephrosis in either kidney." PSS No. 128.1.

On November 26, 2018, Holmes had a "robotic left ureteral reimplantation, flexible cystoscopy, psoas hitch by Dr. Buckley that included a stent implant and removal of adhesions of his bladder to his abdominal wall under general anesthesia." DSS No. 129. Dr. Buckley found "hydronephrosis, unspecified, ureteral obstruction." PSS No. 134.1. She also found "extensive adhesions in the abdomen that were taken down, significant adhesions around the left ureter causing obstruction, adhesion of the bladder to the abdominal wall that required meticulous separation." *Id*. The "postoperative plan" was "nephrostomy removal prior to discharge," a catheter for ten days, and a stent for six weeks. PSS No. 134.3. Dr. Buckley prescribed "12 tablets of Norco (an opioid) with no

refills." DSS No. 130.

On January 8, 2019, Holmes had his "stent removed from his ureter" at UCSD.[11] DSS No. 131. Defendants assert that no opioid was prescribed following this procedure. *See Id.* According to Holmes, Dr. Buckley "did prescribe opioids." PSS No. 132. She further indicated that Holmes is to "continue to include 'appropriate medication' for 'mild pain.'" *Id*. Dr. Buckley counseled Holmes to "utilize timed voiding more frequently so his bladder doesn't get as full." *Id*.

On July 10, 2019, Dr. Buckley again examined Holmes and performed a "cystogram and VCUG." DSS No. 133. Dr. Buckley noted that Holmes complained of "left flank pain/pressure when his bladder gets full" and found it was a "sequela of his ureteral reimplant." DSS No. 134. Dr. Buckley found that Holmes' "symptoms are relatively mild" and "would favor conservative management at this time." *Id*. Dr. Buckley "recommended timed voiding, a process where a patient urinates on a timed schedule." DSS No. 135. Dr. Buckley "made no recommendations that Holmes proceed with any procedures or tests at that time, including surgery, and did not prescribe opioids." DSS No. 136.

## EVIDENTIARY OBJECTIONS

Defendants object to an expert report submitted by Plaintiff and prepared by Dr. Dudley Danoff, on the grounds that the report contains inadmissible hearsay. *See* Doc. No. 142-3.

Generally, evidence proffered either in support of or in opposition to a motion for summary judgment must be admissible for courts to consider the evidence in ruling upon the motion. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A

---

[11] The Court notes that events which post-date the filing of the operative complaint are relevant to Holmes' request for prospective injunctive relief. *See Farmer v. Brennan*, 511 U.S. 825, 846 (1994) (in seeking an injunction, an "inmate may rely, in the district court's discretion, on developments that postdate the pleadings. . . as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction.").

trial court can only consider admissible evidence in ruling on a motion for summary judgment."). "[A] party does not necessarily have to produce evidence in a form that would be admissible at trial" in a motion for summary judgment. *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). Rather, "Rule 56[(c)] requires only that evidence 'would be admissible', not that it presently be admissible." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006). Thus, at the summary judgment stage, the focus is on the admissibility of the evidence itself, not its form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003)). Importantly, "a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.,* 828 F.3d 1098, 1110 (9th Cir. 2016).

Defendants complain that the expert report "was not accompanied by any declaration or deposition testimony," and argue that the report is therefore inadmissible. Doc. No. 142-3 at 2.[12] However, Defendants deposed Dr. Danoff with regard to his expert report. *See* Doc. No. 96-8, Freund Decl. at ¶ 11. Indeed, Defendants have submitted excerpts from Dr. Danoff's testimony in support of their summary judgment motion. *See* Doc. No. 96-12, Def. Ex. N at 254-57. Dr. Danoff previously testified to his medical opinion and presumably the contents of his report, and it stands to reason that he could also do so at trial. Accordingly, the Court **OVERRULES** Defendants' objection to the admissibility of Dr. Danoff's report.

## MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on the threshold ground that Holmes failed to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a) as to his claims against Dr. Currier. In addition, Defendants argue that Holmes' Eighth

---

[12] Pinpoint citations to electronically filed documents refer to the pagination assigned by the CM/ECF system unless otherwise noted.

Amendment claims against Drs. Estock and Currier fail as a matter of law because Holmes cannot establish that his primary care physicians "pursued a medically unacceptable course of treatment and did so in conscious disregard to an excessive risk to Holmes' health." *See* Doc. No. 96 at 30.  In the alternative, Drs. Estock and Currier argue they are entitled to qualified immunity from suit for damages in their individual capacities.  Defendants Diaz, Montgomery, and Nasir argue that summary judgment is appropriate as to Holmes' request for injunctive relief because his underlying claims against Drs. Estock and Currier fail as a matter of law.  In the alternative, Defendants argue that the Court should  summarily deny Holmes' request for injunctive relief because Holmes is "improperly asking this Court to order prison officials to release Holmes' medical care – and all related prison security and custody decisions – to a private physician." *Id*. at 3.

### A. Exhaustion of Administrative Remedies

Defendants argue as an initial matter that Holmes' Eighth Amendment claim against Dr. Currier is subject to dismissal for failure to comply with pre-filing administrative exhaustion requirements.  Holmes responds that he "consistently grieved and exhausted his administrative appeals regarding his kidney problems" and Dr. Currier's "acts and omissions are part and parcel of . . . the continuing violation by all Defendants" of his Eighth Amendment right to adequate medical care.  Doc. No. 131 at 32.

### 1. Legal Standard

"The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) (quoting 42 U.S.C. § 1997e(a)).  "There is no question that exhaustion is mandatory under the PLRA[.]" *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citation omitted).  The PLRA also requires that prisoners, when grieving their appeal, adhere to CDCR's "critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 91 (2006).  "[I]t is the prison's requirements, and not the

PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

The exhaustion requirement is based on the important policy concern that prison officials should have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones*, 549 U.S. at 204. The "exhaustion requirement does not allow a prisoner to file a complaint addressing non-exhausted claims." *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010). Therefore, regardless of the relief sought, a prisoner must pursue an appeal through all levels of a prison's grievance process as long as that process remains available to him. "The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.' Once that is no longer the case, then there are no 'remedies . . . available,' and the prisoner need not further pursue the grievance." *Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005) (emphasis in original) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). "The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Ross*, 136 S. Ct. at 1862; *see also Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010) (PLRA does not require exhaustion when circumstances render administrative remedies "effectively unavailable."). Grievance procedures are available if they are "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738); *see also Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) ("To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'") (quoting *Albino v. Baca*, 747 F.3d 1162, 1171(9th Cir. 2014)).

In *Ross*, the Supreme Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is *not* capable of use to obtain relief." 136 S. Ct. at 1859 (emphasis added). These circumstances arise when: (1) the "administrative procedure . . . operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the "administrative scheme . . . [is] so opaque that it becomes, practically speaking, incapable of use . . . so that no ordinary prisoner can make sense of what it demands;" and (3) "prison

administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60 (citations omitted).

Applying these principles, the Ninth Circuit has specifically found that "[w]hen prison officials fail to respond to a prisoner's grievance within a reasonable time, the prisoner is deemed to have exhausted available administrative remedies within the meaning of the PLRA." *See Andres v. Marshall*, 854 F.3d 1103, 1105 (9th Cir. 2017) (per curiam) (finding prison's six-month failure to respond to an inmate grievance rendered prisoner's administrative remedies unavailable); *accord Dole v. Chandler*, 438 F.3d 804, 809, 811 (7th Cir. 2006) (officials' failure to respond to a "timely complaint that was never received" rendered prisoner's administrative remedies unavailable). The Ninth Circuit has further found administrative remedies "plainly unavailable" where prison officials "screen out an inmate's appeals for improper reasons," *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010), and "effectively unavailable" where they provide the inmate mistaken instructions as to the means of correcting a claimed deficiency, but upon re-submission, reject it as untimely after compliance proved impossible. *See Nunez*, 591 F.3d at 1226. Administrative remedies may also prove unavailable if the prisoner shows an "objectively reasonable" basis for his belief that "officials would retaliate against him if he filed a grievance." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015).

Because the failure to exhaust is an affirmative defense, Defendants bear the burden of raising it and proving its absence. *Jones*, 549 U.S. at 216; *Albino*, 747 F.3d at 1169 (noting that Defendants must "present probative evidence—in the words of *Jones*, to 'plead and prove'–that the prisoner has failed to exhaust available administrative remedies under § 1997e(a)"). At the summary judgment stage, Defendants must produce evidence proving Holmes' failure to exhaust; they are entitled to summary judgment only if the undisputed evidence, viewed in the light most favorable to Holmes, shows he failed to fully exhaust his administrative remedies. *Albino*, 747 F.3d at 1166.

### 2. CDCR Exhaustion Requirements

The CDCR has established an "administrative remedy" for prisoners like Holmes

to pursue before filing suit under § 1983.[13]  *See Williams*, 775 F.3d at 1191 (citing *Albino*, 747 F.3d at 1172) (quotation marks omitted).  Specifically, a California prisoner may appeal "any policy, decision, action, condition, or omission by the department or its staff that [he] can demonstrate as having a material adverse effect upon his . . . health, safety, or welfare."  Cal Code Regs., tit. 15 § 3084.1(a).

Since January 28, 2011, and during the times alleged in Holmes's Complaint, Title 15 of the California Code of Regulations requires three formal levels of appeal review.  *See* Doc. No. 96-6, Gates Decl. at ¶ 7.  Thus, in order to properly exhaust, a California prisoner must, within 30 calendar days of the decision or action being appealed, or "upon first having knowledge of the action or decision being appealed," Cal. Code Regs., tit. 15 § 3084.8(b), "use a CDCR Form 602 (Rev. 08/09), Inmate/Parolee Appeal, to describe the specific issue under appeal and the relief requested."  *Id.* § 3084.2(a).  The CDCR Form 602 "shall be submitted to the appeals coordinator at the institution."  *Id.* § 3084.2(c), § 3084.7(a).

If the first level CDCR Form 602 appeal is "denied or not otherwise resolved to the appellant's satisfaction at the first level," *id.* § 3084.7(b), the prisoner must "within 30 calendar days . . . upon receiving [the] unsatisfactory departmental response," *id.* § 3084.8(b)(3), seek a second level of administrative review, which is "conducted by the hiring authority or designee at a level no lower than Chief Deputy Warden, Deputy Regional Parole Administrator, or the equivalent."  *Id.* § 3084.7(b), (d)(2).

"The third level is for review of appeals not resolved at the second level."  *Id.* § 3084.7(c).  "The third level review constitutes the decision of the Secretary of the CDCR on an appeal, and shall be conducted by a designated representative under the supervision of the third level Appeals Chief or equivalent.  The third level of review exhausts

---

[13] The Court summarizes and applies the CDCR's grievance process as it operated at the time the events giving rise to this action occurred.

25

administrative remedies," *id.* § 3084.7(d)(3), "unless otherwise stated."[14]  *Id.* § 3084.1(b); *see also* CDCR OPERATIONS MANUAL § 541100.13 ("Because the appeal process provides for a systematic review of inmate and parolee grievances and is intended to afford a remedy at each level of review, administrative remedies shall not be considered exhausted until each required level of review has been completed.").

### 3. *Analysis*

Defendants submit the declaration of S. Gates who is "currently employed by the California Correctional Health Care Services ("CCHCS")" as the "Chief of the Healthcare Correspondence and Appeals Branch ("HSCCAB")."  *See* Gates Decl. ¶ 2. Gates declares: "Since August 1, 2008, health care appeals/grievances involving inmate medical, dental, and mental health care issues have been process by the CCHCS, under the Office of Federal Receiver appointed in the class action litigation regarding prison health care."  *Id.* at ¶ 4.  "Before September 1, 2017, health care appeals/grievances were governed by sections 3084-3086" found in Title 15 of the California Code of Regulations.  *Id.* at ¶ 7.  Under this former set of regulations, "health care appeals were subject to three levels of review before administrative remedies were deemed exhausted." *Id.* (citing Cal. Code Regs., tit. 15 § 3087(d)(3)).  Thus, "[u]nder the applicable regulations, Holmes was required to complete all three levels of formal review in order to exhaust CDCR's administrative appeals process."  Doc. No. 96 at 28 (citing Cal. Code Regs., tit. 15 § 3084.7).  Defendants argue that Holmes did not complete the exhaustion process as to his Eighth Amendment claim against Dr. Currier.  Notably, Defendants do not argue that Holmes failed to exhaust his administrative grievances against Dr. Currier because he failed to follow any regulations requiring that he identify her by name in his

---

[14]  For example, "[a] second level of review shall constitute the department's final action on appeals of disciplinary actions classified as 'administrative' as described in section 3314, or minor disciplinary infractions documented on CDC[R] Form 128-A (rev. 4-74), Custodial Counseling Chrono, pursuant to section 3312(a)(2), and shall exhaust administrative remedy on these matters." Cal. Code Regs., tit. 15 § 3084.7(b)(1).

grievances.  Instead, Defendants argue that Holmes did not submit the grievance in which he *did* identify her by name to the Third Level of Review.  Indeed, the "grievance process is required to 'alert prison officials to a problem, not to provide personal notice to a particular official that [she] may be sued." *Reyes v. Smith*, 810 F.3d 654, 659 (9th Cir. 2016) (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)).

It is undisputed that Holmes submitted a grievance on August 16, 2016, in which he wrote that he was "placed in OHU as a form of punishment because [he] was on methadone and in pain."  DSS No. 144; PSS No. 144; Doc. No. 96-11, Def. Ex. F at 58 (Patient-Inmate Health Care Appeal, CDCR 602 HC, Log No. 16034017).  Holmes further wrote in the grievance that "Dr. Kim and C- yard doctor refused to provide me medication."  Def. Ex. F at 56.  It is undisputed that Holmes' grievance was denied at the first level of review.  *See* DSS No. 147; PSS No. 147; Def. Ex. F at 54.  Holmes was dissatisfied and filed an appeal at the second level on October 21, 2016, alleging that he was "in substantial pain daily" and Dr. Currier was refusing to test his urine to determine "what kind of infection" Holmes had, or to provide an antibiotic, which "caus[ed] more pain."  Def. Ex. F. at 59.  It is further undisputed that Holmes' grievance was denied at the second level of review on November 21, 2016.  *See* DSS No. 148; PSS No. 148; Def. Ex. F. at 52-55.

This denial at the second level of review was provided to Holmes both in the original grievance he filed and in correspondence from the CCHCS.  On the 602 HC form, Section E indicates that Holmes' grievance was accepted at the Second Level of Review and assigned to "Dr. Stepke" on October 17, 2016.  *See* Def. Ex. F at 55.  In this section, a box is checked indicating that the "appeal issue" is denied.  *Id.*  There is also a Section F that indicates "**[i]f you are dissatisfied with the Second Level response**, explain reason below; attach supporting documents and submit by mail for Third Level Review."  *Id.* (emphasis in original).  It goes on to inform Holmes that the appeal to the Third Level Review "must be received within 30 calendar days of receipt of prior response" and mailed to "Health Care Appeals, ATTN: Chief, Building C, P.O. Box

588500, Elk Grove, CA 95758." *Id.*

As stated above, Holmes also received correspondence from CCHCS dated November 21, 2016, specifically signed by Dr. Stepke and K. Reilly, informing him that his appeal at the Second Level of Review was denied and he was "advised that his issue may be submitted for a Director's Level Review within the 30 days of receipt of this response if he desires." *Id.* at 52-53. Defendants claim Holmes failed to submit this grievance to the Third Level of Review. *See* DSS No. 150 (citing Gates Decl. at ¶ 16). Holmes disputes this. *See* PSS No. 150. Specifically, Holmes asks the Court to review the exhibit he attached to his previously filed motion for preliminary injunction which he submitted under penalty of perjury. *See* Doc. No. 12 at 12. The exhibit is a copy of an envelope of a mailing sent by Holmes and addressed to "Healthcare, California Prison (HCS), P.O. Box 4038, 660 Suite 400, Sacramento, CA 95812-4038." *Id.*

Holmes claims he previously demonstrated that he submitted the grievance regarding Dr. Currier to the Third Level of Review "by submitting the 602 and responses" on December 28, 2016, and mailing it to the Sacramento address. Doc. No. 12 at 4. The mailing was stamped as follows on January 1, 2017: "Return to sender, not deliverable as addressed, unable to forward." *Id.* at 12. Holmes previously claimed that he did not receive the return of his enveloped until "6 months later." *See* PSS No. 150. However, Holmes has not demonstrated that he attempted to resubmit this grievance after receiving notification that the address was not correct. Based on the record before the Court, it appears undisputed that Holmes did not submit his grievance to the correct address.

Holmes argues that, irrespective of his exhaustion as to the August 16, 2016 grievance, the "claims against Defendant Currier are encompassed within Holmes' grievances which he has sufficiently alleged to have been exhausted" because he has "demonstrated both serial violations and systemic violations against all Defendants, including Currier, justifying application of the continuing violations doctrine." Doc. No. 131 at 33 (citing *Douglas v. California Dept. of Youth Authority*, 271 F.3d 812, 822 (9th

Cir. 2001)).

The "continuing violations" doctrine has been applied to issues of timeliness raised by an applicable statute of limitation, but the Ninth Circuit has not yet applied this doctrine to issues of exhaustion in prisoner civil rights cases. *See e.g.*, *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (applying the "continuing violations doctrine" to consider allegations of unlawful behavior that would otherwise be time-barred). However, several other circuits have done so. *See, e.g.*, *Turley v. Rednour*, 729 F.3d 645, 649, 50 (7th Cir. 2013) ("In order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue if the objectionable condition is continuing."); *Johnson v. Killian*, 680 F.3d 234, 238 (2nd Cir. 2012) (per curiam) (holding that an inmate's 2005 grievance "provided the administration with notice of, and an opportunity to resolve the same problem that would continue intermittently through 2007" and therefore, the claim was sufficiently exhausted); *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1219 (11th Cir. 2010) (holding that an inmate was "not required to initiate another round of the administrative grievance process on the exact same issue each time" an alleged deprivation of rights occurred); *Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008) (an inmate was "not required to begin the grievance process anew … [because] further grievances complaining of the same living situation would have been redundant."); *Johnson v. Johnson*, 385 F.3d 503, 521 (5th Cir. 2004) ("As a practical matter, Johnson could not have been expected to file a new grievance … each time he was assaulted … Johnson's grievances were sufficient to exhaust claims that arose from the same continuing failure to protect him from sexual assault."). "[A]ccording to these circuits, when a prisoner plaintiff grieves a continuing violation, he need not file 'multiple, successive grievances raising the same issue,' and can therefore satisfy his exhaustion requirement 'once the prison has received notice of, and an opportunity to correct [the] problem." *Saif'ullah v. Albritton*, 2017 WL 2834119, at *9 (N.D. Cal. June 30, 2017) (quoting *Turley*, 729 F.3d at 650). In applying the continuing violations doctrine to a statute of limitations argument, the Ninth Circuit has

held that if a claim involves a "delayed, but inevitable consequence" of an ongoing violation, the more recent violation should be treated as a separate claim only if it involves an "independently wrongful, discrete act." *Pouncil v. Tilton*, 704 F.3d 568, 581 (9th Cir. 2012).

It is undisputed that in 2014 Holmes submitted a grievance to CAL prison officials indicated that his "kidneys are in bad pain," noting he had an "infection," and requesting that a nurse inform his PCP "to have blood work done" in order to see what type of infection he had." *See* Doc. No. 96-11, Def. Ex. C at 10 (Patient-Inmate Health Care Appeal, CDCR 602 HC Log No. CAL-HC-14033383). Holmes also noted that he was suffering from "kidney and chest pain." *Id.* Holmes asked to be "seen by a doctor or sent to a hospital to check his kidney function." *Id.* Holmes also wrote that he was not being seen by his primary care physician or receiving medical treatment and he was in "bad pain for 3 days without any pain medication." *Id.* at 12. At the second level of appeal, Holmes wrote that "this delay of access to treatment is causing substantial harm to both [his] kidneys and to [his] health." *Id.* at 13. In responding to Holmes' grievance at the Director's Level, it was noted that Holmes has "significant kidney problems." *See id.* at 8 (Director's Level Decision dated November 25, 2014).

It is further undisputed that in 2015, after Holmes was transferred to CAL-SAC, he filed another grievance with CAL-SAC officials. *See* Doc. No. 96-11, Def. Ex. E at 39 (Patient/Inmate Health Care Appeal, CDCR 602 HC Log No. SAC-HC-15030531). In this grievance, Holmes noted that he had a "history" of his "urine backing up to [his] kidney" and as a result he is in "very bad pain daily." *Id.* He further maintained that the treatment he received "create[ed] a state of constant infection and pain." *Id.* at 40. Holmes contended that the prescribed antibiotics were "not working and are causing more health problems through infections and allergic reactions." *Id.* Holmes further informed prison officials that the delay in receiving care was causing him to be "in pain and with an infection daily." *Id.* at 42. In the Director's Level of Review of Holmes' grievance, it was noted that Holmes "continues to be enrolled in the Chronic Care

30

Program where [his] medical conditions and medications needs are closely monitored, with care provided as determined medically indicated by the PCP." *Id.* at 37.

When Holmes returned to CAL in 2016, he filed yet another grievance which raised many of the same issues that his previous grievances had raised. *See* Def. Ex. F at 54 (Patient-Inmate Health Care Appeal CAL-HC-16034017). In this grievance, Holmes again maintained that he was "in substantial pain daily and . . . being denied pain medication" but he was not "demand[ing] a particular medication." *Id.* at 55. Holmes informed medical personnel at CAL that he had a "very bad urinary track [sic] infection" and was "in very bad pain." *Id.* at 56. As to Dr. Currier, Holmes claimed that even though he told her he was in "substantial pain daily" she would not test his urine to determine the appropriate antibiotic" which "result[ed] in more pain." *Id.* at 59.

Taken in the light most favorable to Holmes, it is undisputed that prison officials, including Holmes' primary care physicians, were on notice of his ongoing serious medical condition and his claims that he had been suffering daily pain since 2014 when he filed and fully exhausted his first health care grievance. The subsequent grievances raised, in substance, the same issues. These issues included his ongoing claims of problems with his kidneys, recurring infections, daily substantial pain, lack of adequate medical care, and denial of medication to alleviate his symptoms and pain.

Upon due consideration, the Court agrees with the Seventh Circuit's reasoning and finds that the "continuing violation doctrine" applies to Holmes' claims, and as such, he "need not file multiple, success grievances raising the same issue . . . if the objectionable condition is continuing." *Turley*, *supra*, 729 F.3d at 650. In October 2015, as stated above, Holmes was informed that he "continued to be enrolled in the Chronic Care Program where [his] medical conditions and medications needs are closely monitored, with care *provided as determined medically indicated by the [primary care physician]*." Def. Ex. E at 37 (emphasis added). It is undisputed that when Holmes returned to CAL, Dr. Currier was his primary care physician. And the record shows that the issues Holmes raised in his initial grievance remained virtually identical while he was under the care of

1  Dr. Estock, his CAL-SAC primary care physicians, and Dr. Currier.  The Court therefore

2  finds that Holmes exhausted his Eighth Amendment claims as to both Dr. Estock and Dr.

3  Currier.  Accordingly, summary judgment in Dr. Currier's favor is not appropriate on

4  exhaustion grounds.

5     **B. Eighth Amendment Claims**

6     The Court next considers the merits of Holmes' Eighth Amendment claims against

7  Drs. Estock and Currier as well as his request for injunctive relief from Defendants Diaz,

8  Montgomery, and Nasir.

9        ***1. Legal Standard***

10     Summary judgment is appropriate when the moving party "shows that there is no

11  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

12  of law." Fed. R. Civ. P. 56(a).  The "purpose of summary judgment is to 'pierce the

13  pleadings and to assess the proof in order to see whether there is a genuine need for

14  trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

15  (citations omitted).

16     As the moving parties, Defendants "initially bear[] the burden of proving the

17  absence of a genuine issue of material fact." *Nursing Home Pension Fund, Local 144 v.

18  Oracle Corp.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477

19  U.S. 317, 323 (1986)).  Defendants may accomplish this by "citing to particular parts of

20  materials in the record, including depositions, documents, electronically stored

21  information, affidavits or declarations, stipulations (including those made for purposes of

22  the motion only), admission, interrogatory answers, or other materials" or by showing

23  that such materials "do not establish the absence or presence of a genuine dispute, or that

24  the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ.

25  P. 56(c)(1)(A), (B).

26     While Holmes bears the burden of proof at trial, Defendants "need only prove that

27  there is an absence of evidence to support [Plaintiff's] case." *Oracle Corp.*, 627 F.3d at

28  387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed,

summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." *Id.* at 323.

If Defendants, as the moving parties, meet their initial responsibility, the burden then shifts to Holmes to establish a genuine dispute as to any material facts that exist. *Matsushita*, 475 U.S. at 586. To establish the existence of a factual dispute, Holmes must then present evidence in the form of affidavits and/or admissible discovery material to support his contention that a genuine dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. Additionally, a "verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). Holmes must also demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of his suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for him. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

If Holmes "fails to properly support an assertion of fact or fails to properly address [Defendant's] assertion of fact, as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ." Fed. R. Civ. P. 56(e)(2). Nor may the Court permit Holmes, as the opposing party, to rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). A "motion for

summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249–50; *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006); *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("'[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.'") (quoting *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996)) (brackets in original)).

### 2. Deliberate Indifference Standard

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). The Eighth Amendment's Cruel and Unusual Punishments Clause is violated when prison officials provide inadequate medical care in a manner that is deliberately indifferent to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 105. Medical needs include a prisoner's "physical, dental, and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

To show "cruel and unusual" punishment under the Eighth Amendment, Holmes must point to evidence in the record from which a trier of fact might reasonably conclude that Drs. Estock and Currier's medical treatment placed Holmes at risk of "objectively, sufficiently serious" harm and that both Drs. Estock and Currier had "sufficiently culpable state[s] of mind" when they either provided or denied him medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (internal quotations omitted). Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002); *Toguchi*, 391 F.3d at 1057 ("To establish an Eighth Amendment violation, a prisoner 'must satisfy both the objective and subjective components of a two-part test.'") (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)).

The objective component is generally satisfied so long as the prisoner alleges facts to show that his medical need is sufficiently "serious" such that the "failure to treat [that]

condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement*, 298 F.3d at 904 (quotations omitted); *see also Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("serious" medical conditions are those a reasonable doctor would think worthy of comment, those which significantly affect the prisoner's daily activities, and those which are chronic and accompanied by substantial pain).

The subjective component requires Holmes to demonstrate that the officials had the culpable mental state, "'deliberate indifference' to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).  As stated above, "deliberate indifference" is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Toguchi*, 391 F.3d at 1057.  Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

### 3. Analysis

The parties do not dispute that Holmes has serious medical needs.[15]  However, the parties strongly contest whether Drs. Estock and Currier were deliberately indifferent to Holmes' serious medical needs.  The Court considers the evidence regarding each physician's treatment of Holmes in turn.

---

[15] Indeed, as set forth herein, Holmes' serious medical needs are well-documented in his medical records.  Moreover, California Correctional Health Care Services ("CCHCS") acknowledged this need in 2014 by noting that Holmes has "significant kidney problems."  *See* Doc. No. 96-11, Def. Ex. C at 8 (CCHCS Director's Level Decision dated Nov. 25, 2014).

a. <u>Dr. Estock</u>

Dr. Estock moves for summary judgment in her favor, arguing that Holmes "cannot establish" that she "pursued a medically unacceptable course of treatment and did so in conscious disregard to an excessive risk to Holmes' health." Doc. No. 96 at 30.

To determine whether a reasonable jury could find a defendant-physician deliberately indifferent, the Court must "scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect." *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

The inquiry here requires a thorough review of the nature and timing of the medical care provided by Dr. Estock to Holmes during the approximate three-month period during which she served as his primary care physician. Holmes challenges the adequacy of that care in three primary respects. First, he alleges to have received medically unacceptable treatment while under Dr. Estock's primary care following the nephrostomy tube replacement performed by Dr. David Hadley. Second, Holmes contends that Dr. Estock's failure to obtain a second opinion regarding the necessity of surgical intervention constituted deliberate indifference to his medical needs. Third, Holmes argues that Dr. Estock's substantial indifference resulted in his transfer to another institution without replacing his nephrostomy tube or having any plan to replace the nephrostomy tube.

*i. Nephrostomy Tube Replacement and Removal*

Dr. Estock claims she was not deliberately indifferent with regard to Holmes's medical treatment involving his nephrostomy tube and the subsequent removal of the tube.

As previously noted, Dr. David Hadley replaced Holmes' nephrostomy tube on May 9, 2014. *See* DSS No. 31; PSS No. 31 (citing Boxer Decl. at ¶ 18; Doc. No. 96-12, Def. Ex. I at 52-55. In Dr. Hadley's discharge instructions, it is undisputed that he instructed that Holmes' nephrostomy tube be "flushed every 12 hours and the dressing be

changed every three days and as needed." *See* DSS No. 32; PSS No. 32 (citing Boxer Decl. at ¶ 18; Def. Ex. I at 55).  However, it is also undisputed that additional instructions "on file from Loma Linda Hospital on Holmes' tube care" informed that "[i]f redness, swelling or soreness of the surrounding skin is noted, increase frequency of cleaning (i.e., twice daily instead of only once), and apply an over the counter triple-antibiotic ointment (i.e., Polysporin) after every cleaning."  PSS No. 32.

Holmes testified that when Dr. Hjerpe was his primary care physician, the skin surrounding the insertion of this nephrostomy tube would be cleaned but when Dr. Estock became his primary care physician in May 2014, she did not "renew" these orders to clean this area.  PSS No. 33.1.  He further testified that he asked the nurses to clean the skin surrounding the nephrostomy tube but was told "the only way they could clean" that area was if his primary care physician provided "specific orders to do it."  PSS No. 34.

Dr. Estock maintains that the undisputed facts show that from "May 9, 2014 to July 14, 2014, Holmes was seen by nurses three times every day, was seen by a CDCR doctor approximately every 14 days, and was seen by Dr. Hadley." *Id*. at 31 (citing DSS Nos. 31, 33, 34, 40, 42, 43, 46, 51, 53, 56, 72).  Dr. Estock points out that Holmes was seen by CDCR physicians six times from May 2014 to July 14, 2014, the period during which she served as Holmes' PCP.  *See* Doc. No. 96-4, Estock Decl. at ¶ 4.  Dr. Estock further attests that "[u]pon receipt of Dr. Hadley's instructions on May 9, 2014, I wrote order[s] mimicking his orders to ensure that Mr. Holmes was receiving proper care." *Id*. at ¶ 6.

Dr. Danoff opines that his review of Holmes' medical records indicates that there was "no such order from Dr. Estock" to "clean the area around the tube."  Danoff Rep. at 6.  He further opines that "[p]roper cleaning of the tube itself and the skin surrounding the tube is extremely important to avoid infection." *Id*.

Dr. Estock was Holmes' primary care physician until July 14, 2014.  Estock Decl. at ¶ 4.  According to Dr. Estock, she last examined Holmes on July 2, 2014 and "did not see any problems with the nephrostomy tube, including any signs of infection." *Id*. at ¶

12.  Both Defendants and Holmes submit Holmes' "nursing care record" for July 10, 2014.  Def. Ex. I at 141; Doc. No. 132-3, Vogel Decl., Pl. Ex. 3 at 1912.  The physician of record is noted at Dr. Estock.  *See id.*  One entry on this day notes "incision site" and "redness, swelling."[16]  *Id.*  On July 12, 2014, two days before he was admitted to this hospital for a severe skin infection, there is a notation in Holmes' nursing care record indicating Holmes is experiencing "pain level of 9/10 [at] nephrostomy site."  Def. Ex. I at 143.  However, on July 13, 2014, the nursing care record noted that Holmes' nephrostomy bag was "intact" and there was "no sign of infection."  Pl. Ex. 4 at 1920.

On July 14, 2014 at 2:38 in the afternoon, Holmes is noted as having "abd[ominal] pain/diarrhea/ fever/sharp chest pain" the day prior and a "foul smell out of nephrostomy site" with "pus com[ing] out."  Def. Ex. I at 87.  Holmes was taken to Pioneers Memorial where medical staff removed Holmes' nephrostomy tube "without consultation of a urologist" and in direct contradiction of Dr. Hadley's "recommendation that the tube was to stay in place until another urologist opinion with regard to definitive care was done."  Danoff Rep. at 7.  Danoff opines that to "remove the tube without plans to replace it immediately, and against urological expert instructions, falls below the minimum standard of care."  *Id.*

Dr. Estock claims that she was not "consulted on the decision to have Mr. Holmes transported to [Pioneers Memorial] on July 14, 2014 to have his nephrostomy tube removed."  Estock Decl. ¶ 13.  Moreover, she maintains that Holmes' removal of his nephrostomy bag in early July 2014 – not any actions or lack thereof on her part – "more

---

[16] Between these comments is what looks to be either an "s" or a "c" with a line over it.  *Id.*  Defense counsel attests that she researched the meaning behind these medical abbreviations and asks the Court to take judicial notice of the websites in which "the letter 'c' with or without a line over it means 'with' in medical records, and the letter 's' without or without a line above it means 'without' in medical records.  Freund Suppl. Decl., Doc. No. 142-4 at ¶ 4; *see also* Doc. No. 142-5.  However, it is not entirely clear that the entry is an "s" or a "c."  Therefore, even if the Court took judicial notice of these medical abbreviations, it would not resolve the issue because it is not clear which letter it is nor do the Defendants provide a declaration of the person who made this entry to clarify its meaning.

1   likely than not led to further bacterial contamination and bacteria entering Mr. Holmes'

2   blood stream" resulting in the need to remove the tube completely.  Doc. No. 96 at 33.

3   According to Dr. Boxer, a Board-certified urologist retained by Defendants as an expert,

4   if Holmes had "cooperated with CDCR medical staff, he may have avoided the cellulitis

5   and abscess at the nephrostomy site, which necessitated the removal of the tube."  Boxer

6   Decl. ¶ 8.

7        Holmes challenges Drs. Estock and Boxer's speculative statements.  Dr. Danoff

8   notes that Holmes' medical records state that after the bag was ultimately replaced –

9   which took longer than it should have because CAL did not have any of these bags in

10  stock – the July 13, 2014 "nursing report stated that 'no resulting problems were noted.'"

11  Danoff Rep. at 6.  In addition, a "separate nurse report on [July 13, 2014] states that they

12  'cleaned with alcohol of area around catheter' and notes that there was 'no sign of

13  infection' on Holmes' skin."  *Id.* at 6-7.

14       According to Holmes, Dr. Estock "herself warned Plaintiff in 2014 that removal of

15  his nephrostomy tube could lead to loss of kidney function, loss of the kidney itself, or

16  even death," yet he "lived without a nephrostomy tube or stent for more than four years."

17  Doc. No. 131 at 38.  And as Dr. Danoff opines, the decision to "remove the tube without

18  plans to replace it immediately, and against urology expert instructions, falls below the

19  minimum standard of care."  Danoff Rep. at 7.  Defendants offer no evidence or expert

20  opinion disputing this opinion.  In fact, when Dr. Estock learned that Holmes wanted to

21  remove his nephrostomy tube, she consulted with him and noted in his medical record:

22  "Patient conflicted leave tube in; agrees to reluctantly to do so but refuses nursing

23  irrigation because 'that caused me problems before.'"  Boxer Decl. at ¶ 21.  Estock

24  "explained the repercussions of him removing the tube."  Estock Decl. ¶ 8.  Specifically,

25  Estock wrote in the interdisciplinary progress notes that she explained "at length, of the

26  damages (Holmes) would do to the kidney if he removed the nephrostomy tube, damages

27  to include, but not limited to, infection, loss of kidney function or kidney itself and/or

28  death."  Def. Ex. I at 58 (Interdisciplinary Progress Notes dated May 9, 2014).  Holmes

argues that Estock "knew of the life threatening damage that would be done to Holmes if he did not have a nephrostomy tube in while awaiting a permanent solution." PSS No. 36.2.

Ultimately, material factual disputes exist regarding the cause of Holmes' skin infection and whether he received medically acceptable treatment for the infection while under Dr. Estock's primary care. In addition, a reasonable jury could find that the failure to replace Holmes' nephrostomy tube amounted to deliberate indifference to his serious medical needs.

### ii. Second Opinion Regarding Surgical Intervention

Dr. Estock disclaims any liability with respect to her decision to "not recommend that Mr. Holmes go to UCSD for a second opinion" regarding surgical intervention to treat his serious medical needs. Estock Decl. ¶ 10.

It is undisputed that "[w]hen Holmes saw Dr. Hadley . . . on March 20, 2014, the doctor had possibly planned to perform a reconstructive surgery but performed a cystoscopy prior to the surgery and documented 'no stricture identified in left ureter, open revision [surgery] not currently indicated.'" DSS No. 27 (citing Boxer Decl. at ¶ 17; Def. Ex. I. at 49). As Dr. Danoff summarizes in his report, "[i]n March 2014 Dr. Hadley was prepared to proceed with the surgery, and after removing the nephrostomy tube was not certain of the exact location of the stricture or its extent" and therefore, he "requested a second opinion before proceeding with the surgery." Danoff Rep. at 5.

Defendants claim that Dr. Hadley was no longer recommending surgery, citing to a "Primary Care Provider Progress Note" dated June 18, 2014 that appears to have been prepared by Dr. Hjerpe. Def. Ex. I at 74. On this form there are four notations purportedly indicating Dr. Hadley's opinion that: "(1) Nephrostomy tube not for long term use (can be kept in temporarily pending 2nd opinion); (2) no indication for chronic stenting; (3) no clear indication for any operative intervention; (4) [Dr. Hadley] is recommending a 2nd opinion." *Id.* Defendants rely on these notes to support their claim that an operation for Holmes was no longer a treatment option for him. However, this

interpretation is clearly at odds with the progress reports written by Dr. Hadley. Moreover, these notes are Dr. Hjerpe's interpretation of his discussion with Dr. Hadley regarding Holmes' medical care. The record does not include any declaration by Dr. Hjerpe confirming that this discussion was definitive regarding a surgical recommendation, or lack thereof, by Dr. Hadley.

Dr. Estock attests that she learned on May 27, 2014 that "Dr. Hadley was no longer offering Mr. Holmes surgery." Estock Decl. ¶¶ 10-11. But a review of the progress notes indicates that this was not necessarily so; rather, Dr. Hadley was uncomfortable "offering the patient any type of reconstruction as it is unclear where [the] pain is arising from" and again urged a "2nd opinion" with UCSD before proceeding with surgery. Def. Ex. I at 64-65. The evidence presents a material factual dispute regarding whether Dr. Hadley was no longer recommending surgery or if he was merely requesting a second opinion before proceeding with surgery.

Nevertheless, Defendants argue that Dr. Estock was "not required to follow a non-CDCR doctor's recommendation that the opinion come from UCSD because that doctor is not authorized to order treatment for an inmate." Doc. No. 96 at 33. This argument conflicts with Defendants' position, *supra*, that Dr. Estock followed Dr. Hadley's orders "to ensure that Mr. Holmes was receiving the proper care." Estock Decl. ¶ 6. Moreover, Dr. Hadley's orders specifically included a request that Holmes obtain a second opinion at UCSD. Dr. Estock claims she believed that Dr. Hadley's orders would ensure "proper care" for Holmes, but she appears to have initially disregarded the recommendation regarding a second opinion on surgical intervention. *Id*. Dr. Estock waited more than a month to submit the request for the second opinion as "recommended by Dr. Hadley at LLUMC," and then did so only four days prior to Holmes' transfer to another institution. Def. Ex. I. at 81.

In sum, disputed material facts exists regarding Dr. Hadley's recommendation regarding surgical intervention and the need for a second opinion. Meanwhile, the record reflects that Dr. Estock did not request a second opinion regarding surgical intervention –

despite the clear request by Dr. Hadley due to Holmes' complicated medical condition – until after she removed the temporary medical hold on Holmes' transfer and only four days before Holmes was transferred to another prison.  *See* Feinberg Decl. at ¶ 16; Def. Ex. I at 81.  A reasonable jury could find based on these facts that Dr. Estock's delay in requesting a second opinion constituted deliberate indifference to Holmes' serious medical needs.  *See Estelle*, 429 U.S. at 104-05 (holding that a delay in providing medical care may manifest deliberate indifference).

### iii. Temporary Medical Hold and Transfer

Dr. Estock argues that there are no disputed issues of material fact that would demonstrate she was deliberately indifferent to Holmes' serious medical needs based on his transfer to CAL-SAC.

As noted above, Holmes' MCC form was updated in June 2013 to "indicate that tertiary consultations were required."  Feinberg Decl. ¶ 8.  Holmes' MCC form was updated again in December 2013 to "reflect a temporary medical hold until March 1, 2014 due to a pending surgery."  *Id.* at ¶ 9.  This temporarily hold remained in place until it was removed by Dr. Estock on June 27, 2014.  *See id.* at ¶ 14; *see also* Def. Ex. I at 76.  According to Dr. Estock, because "Dr. Hadley was no longer offering Mr. Holmes surgery, [she] was required to remove the medical hold."  Estock Decl. ¶ 11.

Dr. Feinberg, the Chief Medical Consultant for the CCHCS Office of Legal Affairs since 2017, agrees that Dr. Estock was obligated to remove the temporary medical hold "once Dr. Hadley was no longer recommending a surgery."  Feinberg Decl. ¶ 15.  As detailed above, however, disputed issues of material fact exist regarding whether Dr. Hadley was in fact no longer recommending surgery or if he instead was conditioning the recommendation on receipt of a second opinion.  Under these circumstances, a reasonable jury could conclude that Dr. Estock's removal of the temporary medical hold amounted to knowledge and disregard of "an excessive risk to inmate health and safety."  *Toguchi*, 391 F.3d at 1057.

Dr. Estock declares she "played no role in the decision that Mr. Holmes be transferred to California State Prison, Sacramento."  Estock Decl. ¶ 25.  But it is undisputed that up until the time and date of Holmes' transfer, Dr. Estock served as his primary care physician and played the key role in decisions regarding Holmes' medical care.  Under her care and approximately twelve hours after Holmes' was noted to have a "foul odor" and pus coming from the incision site of his nephrostomy tubes, requiring medical attention at an outside hospital, Holmes was transferred to Folsom State Prison in the middle of the night.  *See* DSS Reply No. 77.  Dr. Danoff criticized Holmes' transfer to another institution without replacing his nephrostomy tube or having any plan to replace the nephrostomy tube as Holmes had an "obstructed kidney, recurrent urinary tract infections."  Danoff Depo. at 5:14-17.

Furthermore, Holmes submits as evidence CCHCS's "Health Care Department Operations Manual" in support of his opposition to summary judgment.  Vogel Decl., Pl. Ex. 3.  The manual states that "[e]ach transfer of care within CDCR shall be facilitated through a handoff process where information is provided by the designated sending care team member to the designated receiving care team member."  *Id.* at 3.1.9(c)(1)(A).  It goes on to state that for "transfers of care between points of care, the patient's Primary Care Team (PCT) shall ensure that all outstanding primary care has been provided, ordered, and communicated to the receiving care team."  *Id.* at 3.1.9(c)(1)(A)(2).  Other than Dr. Estock, Defendants do not identify any CAL healthcare worker who was part of Holmes' PCT at the time he was transferred.  Dr. Estock had not examined Holmes since July 2, 2014.  And Defendants proffer no evidence to demonstrate that Dr. Estock complied with the CDCR's regulations regarding transfer of an inmate with a serious medical condition.

Upon due consideration of the material facts set forth above, a reasonable jury could conclude that Dr. Estock's decision to remove Holmes' temporary medical hold, and the lack of evidence in the record that she monitored or treated his serious medical

condition after July 2, 2014, particularly in the days and hours leading up to his transfer, constitute deliberate indifference to Holmes' serious medical needs.

### iv. Conclusion

In sum, the Court finds that genuine issues of material fact preclude summary judgment in favor of Dr. Estock as to Holmes' Eighth Amendment claim against her.

### b. Dr. Currier

Dr. Currier argues that Holmes cannot establish as a matter of law that she was deliberately indifferent to his serious medical needs. According to Dr. Currier, Holmes' only relevant allegation is that she was "deliberately indifferent to his medical needs because she would not prescribe him pain medication, besides psychiatric medications, and would not prescribe him antibiotics."[17]  Doc. No. 96 at 37.  Dr. Currier asserts that she cannot be held liable under the Eighth Amendment for declining to prescribe Holmes his preferred medication.

Holmes challenges the adequacy of Dr. Currier's medical care on two grounds. Holmes asserts that Dr. Currier's failure to prescribe pain medications or antibiotics to treat his recurring infections constitutes deliberate indifference.  Doc. No. 131 at 38-39. Holmes further contends that because Dr. Currier "knew of his severe condition, she should have followed the advice of his previous urologists and primary care physicians and arranged for surgical treatment of his diseased kidney." *Id.* at 38.

The Court once again must "scrutinize the particular facts" to determine whether a reasonable jury could conclude that Dr. Currier acted with "substantial indifference" to Holmes' serious medical needs. *Wood*, 900 F.2d at 1334.

---

[17] Holmes' allegations as to Dr. Currier are not quite so limited; in the operative complaint, Holmes alleges that "[f]rom July 15, 2014 *until September 4, 2018* Mr. Holmes had not received the medical care necessary to avert permanent damage to his kidney(s)."  TAC ¶ 7.  During this time period, Dr. Currier served as Holmes' primary care physician.  *See* Currier Decl. at ¶ 5.

*i. Pain Management*

Holmes returned to CAL in July 2016.  On July 14, 2016, Dr. Currier became Holmes' primary care physician.  *See* Currier Decl. at ¶ 5.  According to Dr. Currier, Holmes "presented with pain during urination, and bacteria in his urine" and she prescribed an antibiotic.  *Id.*  Holmes was placed back in the OHU to taper off methadone and Dr. Currier noted that Holmes had "kidney obstruction;" Dr. Currier also noted that Holmes did not have a stent, and that previous stents and nephrostomy tubes had been removed.  *See* Pl. Ex. 3 at 2186 (PCP Progress note dated July 14, 2016).  Dr. Currier also noted "chronic [UTI]s" and that Dr. Estock had "made referral to urology."[18]  *Id.*

Dr. Currier examined Holmes again on July 28, 2016.  *See* Currier Decl. at ¶ 6; Def. Ex. I at 167 (PCP Progress Note dated July 28, 2016).  These notes indicate Holmes purportedly requested Tylenol 3 for pain, but Dr. Currier "declined" the request.  *Id.* Because Tylenol 3 contains Codeine, an opioid, Dr. Currier "believed that [Holmes] was exhibiting drug-seeking behavior" because he had specifically requested that medication. Currier Decl. ¶ 6.  A review of Holmes' medical records by Dr. Danoff indicates that "[b]etween the time period of [July 15, 2015] through July 15, 2016, in spite of the multiple requests and complaints by Holmes, he was not provided with any surgical options, urologic or medical expert care or consultations in order to provide adequate treatment for his condition" and "[i]nstead, Holmes was prescribed antibiotics *and Tylenol 3 for his pain*."  Danoff Rep. at 10 (emphasis added).  Dr. Currier does not indicate in her declaration whether she reviewed Holmes' medical records prior to examining him and denying his request for pain medication.

According to Dr. Currier, she referred Holmes' request to the "CAL Pain Committee, which consisted of other Primary Care Physicians and the Chief Medical Executive of CAL, Dr. Stepke."  *Id.* at ¶ 8.  Dr. Currier attests that the CAL Pain

---

[18] It is not clear from the record whether this was a new referral or a reference to the referral made nearly two years prior.

Committee "reviewed Mr. Holmes' case and it was discussed that he was seeking pain medication, specifically morphine and Tramadol, which both have a high risk of addiction." *Id.* at ¶ 9. However, Defendants do not point to any evidence in the record of Holmes requesting morphine and Tramadol. The committee ultimately recommended "self-catherization, follow up with urology, and formulary non-opiate pain prescriptions for as needed use." *Id.* Assuming Dr. Currier's representation of the committee discussions is accurate, it appears that they did not discuss whether Tylenol 3 would be appropriate for treatment of Holmes' well-documented pain.

"Holmes had no medical history indicating mental illness or significant drug or alcohol abuse." *See* Danoff Rep. at 4; DSS Reply No. 103.1. Moreover, it is undisputed that Holmes is allergic to Ibuprofen and all antibiotics except for Augmentin. *See* PSS No. 103; DSS Reply No. 103. Despite Holmes' medical records indicating his allergy to Ibuprofen, this is one of the medications Dr. Currier "encouraged" him to try in lieu of prescribing Tylenol 3. Currier Decl. ¶ 10.

Dr. Currier examined Holmes on September 19, 2016 and noted "that he continues with pain [and] doesn't want to try alternatives to narcotics [and he states] medicines like Tylenol do not help him." Def. Ex. I at 171 (Primary Care Provider progress note dated Sept. 19, 2016). Dr. Currier also documented that Holmes was suffering from "bilateral flank pain" and diarrhea. *Id.* Holmes informed her that he was suffering from chronic back pain which he attributed to his well-documented chronic urinary tract infections. *See id.* Dr. Currier examined Holmes again on October 17, 2016 and noted that Holmes "continues" with the "same pain." *Id.* at 174 (Primary Care Provider progress notes dated Oct. 17, 2016). Dr. Currier also examined Holmes on December 14, 2016. *See id.* at 175 (Primary Care Provider progress notes dated Dec. 14, 2016). She noted that Holmes still had back pain, for which she recommended non-opiate psychiatric medication options, but Holmes informed her he "didn't want psych meds." *Id.*

Meanwhile, Dr. Dean Hadley examined Holmes on December 19, 2016 and prescribed Holmes Tylenol 3 to be taken before two different procedures. *See id.* at 176

(Initial Consult, Dr. Dean Hadley dated Dec. 19, 2016).  Dr. Hadley listed Holmes' problems as "ureter obstruction, swollen kidney, left flank pain, secondary left vesicoureteral reflux, and intermittent self-catherization of bladder." *Id.* at 177.

Dr. Currier examined Holmes on February 23, 2017.  *See id.* at 181 (Primary Care Provider progress notes dated Feb. 23, 2017).  Holmes indicated that he continued to have kidney pain.  *See id.*  Dr. Currier noted "we also do not [treat] chronic pain [with] opioids [and Holmes] will not be on [Tylenol 3]." *Id.*

Dr. Danoff testified that Holmes "has a highly obstructed kidney."  Danoff Depo. at 53:21-22.  Holmes' kidney is "chronically infected", and he has "pain with or without the [nephrostomy] tube." *Id.* at 53:22-23.  Dr. Danoff opined that "patients with this kind of an obstructed kidney, chronic infection, resistive organisms" is the "perfect setup for pain." *Id.*  at 53:24-45; 54:1.  Dr. Danoff testified that "if the problem with the kidney is not resolved and the patient continues to have pain, it's both prudent and humane thing to do to make sure that that patient is comfortable," and while long term narcotic treatment is not the "perfect solution," it is also not "inappropriate." *Id.* 54:22-25; 55:1-2.  Dr. Danoff also testified that by "September of '18, [Holmes] finally does make it to UC San Diego," and at the first visit with Dr. Jill Buckley, "she clearly gets on the case and does what needed to be done years before." *Id.* at 93:6-12.  He further testified that "for many years, this patient was completely neglected" and "that would be as a urologist my conclusion." *Id.* at 97:21-23.

"[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health.'" *Toguchi*, 391 F.3d at 1058 (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).  Here, the Court finds that there is evidence in the record with regard to the denial of narcotic pain medication by Dr. Currier that raises a genuine issue of material fact as to whether this treatment was medically unacceptable and in conscious disregard of a risk to Holmes' health in light of his serious

medical condition and the pain he seemed to consistently endure. *Jackson*, 90 F.3d at 332; *see also Wakefield v. Thompson*, 177 F.3d 1160, 1164–65 (9th Cir. 1999). Drawing all inferences in the light most favorable to Holmes as the nonmoving party, a reasonable jury could conclude that Dr. Currier was deliberately indifferent to Holmes' pain.

### ii. Second Opinion Regarding Surgical Intervention

After his transfer back to CAL, and while under Dr. Currier's care, Holmes was seen in a telemedicine consultation with Dr. Fawcett on October 6, 2016. *See* Def. Ex. I at 172 (Telemedicine Custody Consultation dated Oct. 6, 2016). Dr. Fawcett noted Holmes' medical history and that past treatment by CDCR officials had not eliminated the "problem of his recurring infections," as Holmes "continued to have symptomatic infections." *Id.* Dr. Fawcett further noted that Holmes "might need the auto transplant" but since Holmes has been at CAL "these things have not been done." *Id.* Dr. Fawcett observed that Holmes "continues to have urinary tract infections" which cause him to be "feverish and off balance." *Id.* Dr. Fawcett recommended "[c]onsultation at UC San Diego," as they "would be better able to manage this difficult case." *Id.* at 173. There is a stamp with "T. Currier, D.O" and a notation "RFS to UCSD done" which is dated October 11, 2016. *Id.* It also appears that Dr. Currier's signature appears under the stamp with her name. *See id.* However, the record contains no corresponding order and instead reflects that Holmes was not seen at UCSD until September 4, 2018, nearly two years after Dr. Fawcett's recommendation, and more than four years after the initial recommendation that Holmes' physicians seek a second opinion at UCSD. *Id.* at 195.

Based on this record, a reasonable jury could conclude that Dr. Currier was deliberately indifferent to Holmes' serious medical needs. *See Jett*, 439 F.3d at 1097 (deliberate indifference may be found "where prison officials and doctors deliberately ignore[ ] the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner.") (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066–67 (9th Cir. 1992). Again, the Court recognizes that a difference of opinion between an inmate and prison medical personnel, or between medical professionals, regarding

appropriate medical treatment does not rise to the level of a constitutional violation. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Toguchi*, 391 F.3d at 1058.  However, this is not such a case.  It is beyond dispute that Holmes has a very complicated and serious medical issue.  It is further undisputed that there was no difference of opinion regarding the need for a second opinion regarding possible surgical intervention – urologists on multiple occasions specifically recommended that Holmes be seen by medical personnel at UCSD because of the complexity of medical condition.

### *iii. Conclusion*

In sum, the Court finds that genuine issues of material fact preclude summary judgment in favor of Dr. Currier as to Holmes' Eighth Amendment claim against her.

### F. Qualified Immunity

Drs. Estock and Currier move for summary judgment on the alternative ground that they are entitled to qualified immunity from suit.

### *1. Legal Standard*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  As such, "[a]n official sued under § 1983 is entitled to qualified immunity unless it is shown that the official [1] violated a statutory or constitutional right [2] that was clearly established at the time of the challenged conduct."  *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (internal quotations omitted).  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.  If either prong is dispositive, a court need not analyze the other prong. *See id.* at 236-37.

"[I]n resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual

defendant (as viewed in a light most favorable to the plaintiff)." *Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000).  Additionally, courts must take care to "consider the state of the law at the time of the alleged violation." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007).  Importantly, the Supreme Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1775–1776 (2015) (quoting *Ashcroft*, 563 U.S. at 742).

### 2. Analysis

As set forth in detail above, viewed in the light most favorable to Holmes, the evidence could establish that Drs. Estock and Currier were deliberately indifferent to Holmes' serious medical needs.  *See Jeffers*, 267 F.3d at 907 (citing *Crawford-El v. Britton,* 523 U.S. 574, 598 (1998)).  In other words, a rational jury could conclude that Drs. Estock and Currier violated Holmes' Eighth Amendment right to adequate medical care.  Thus, "the next . . . step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.  Here, it undoubtedly was.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," but only with respect to "open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  It was well-established by 2014 that deliberate indifference to the serious medical needs of a prisoner violates the Eighth Amendment.  *Estelle*, 429 U.S. at 104.  Moreover, it has been settled since 2004 that if a "chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health,'" that may also violate a prisoner's Eighth Amendment rights.  *Toguchi*, 391 F.3d at 1058 (citing *Jackson*, 90 F.3d at 332).

### 3. Conclusion

Based on the current record, Drs. Estock and Currier are not entitled to qualified immunity with respect to Holmes' Eighth Amendment claims against them.

50

1

## G. **Injunctive Relief**

2

Defendants Diaz, Montgomery, and Nasir move for summary judgment as to

3

Holmes' claim for injunctive relief.[19]  Holmes seeks "prospective relief in the form of a

4

continuing remedial plan to ensure that Plaintiff's condition is adequately treated while

5

he remains incarcerated . . . Specifically, he requests that his surgeon, Dr. Jill Buckley,

6

who successfully repaired his kidney, be consulted on any significant urological

7

treatment in the future."  Doc. No. 131 at 41.

8

### *1. Legal Standard*

9

"A plaintiff seeking injunctive relief against the State . . . need only identify the

10

law or policy challenged as a constitutional violation and name the official within the

11

entity who can appropriately respond to injunctive relief."  *Hartmann v. Cal. Dep't of*

12

*Corrections and Rehab.*, 707 F.3d 1114, 1128 (9th Cir. 2013) (citing *Hafer v. Melo,* 502

13

U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  As this Court

14

previously found, "Defendant Diaz, Secretary of CDCR, Defendant Nasir, the Healthcare

15

CEO at CSP-CAL, and Defendant Montgomery, the Warden of CSP-CAL, are

16

sufficiently connected to the implementation and enforcement of CDCR healthcare

17

policies and regulations, such that they could respond to a court order granting Holmes

18

prospective injunctive relief."  *See* Doc. No. 79 at 8.

19

An injunction is an "extraordinary remedy never awarded as of right."  *Winter v.*

20

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "To be entitled to a permanent

21

injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that [he] has

22

suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that

23

the balance of hardships justify a remedy in equity; and (5) that the public interest would

24

not be disserved by a permanent injunction."  *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784

25

26

27

[19] Defendants cite to and rely upon the preliminary injunction standard.  *See* Doc. No. 96 at 43-50.

28

However, as Holmes correctly notes, he is seeking *prospective* injunctive relief and is not currently seeking preliminary injunctive relief.  *See* Doc. No. 132 at 41.

1   (9th Cir. 2019) (quoting *Indep. Training & Apprenticeship Program v. Cal. Dep't of*

2   *Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013)).

3      **2. Analysis**

4     Holmes argues that "the CDCR has a custom and practice of failure to treat

5   Plaintiff's congenital defect in his left kidney which requires ongoing medical treatment."

6   Doc. No. 131 at 47.  According to Holmes, Defendants Diaz, Nasir, and Montgomery:

> [M]aintained a practice and custom of failing to take the steps necessary for
> Plaintiff to receive adequate care. This custom of failure and omission to treat
> Plaintiff can be seen in Defendants' repeated delays in referring Plaintiff to
> tertiary specialists , e.g. a [two] month delay after transfer to CSP-SAC in
> seeing a specialist; Plaintiff did not receive a stent until early December 2018;
> the repeated ignoring of the advice and recommendations of tertiary
> specialists; failing to provide an auto-transplant recommended by Dr. Fawcett
> and Dr. Stoller; removing the nephrostomy tube after Dr. Hadley said not to;
> and the repeated treatment of Plaintiff's secondary, chronic infections which
> were caused by Defendants' failure to follow the specialists'
> recommendations which resulted insignificant pain because of the ineffective
> treatment by anti-biotics and self-catheterization.

16   *Id.*

17     As noted above, the parties do not dispute that Holmes suffers from a "serious

18   medical need," *Jett*, 439 F.3d at 1096, and a reasonable jury could conclude that the

19   treatment provided by Drs. Estock and Currier was "medically unacceptable under the

20   circumstances" and chosen "in conscious disregard of an excessive risk" to his health,

21   *Hamby*, 821 F.3d at 1092.  If a jury did so find, "the deprivation of [Holmes']

22   constitutional right to adequate medical care" would be "sufficient to establish irreparable

23   harm." *Edmo*, 935 F.3d at 798.  Moreover, Holmes has put forth sufficient evidence to

24   call into question the adequacy of damages as a sole remedy should he prevail in this

25   action given his ongoing significant medical needs.[20]  According to Holmes, "Defendants

---

28   [20] The Court takes judicial notice of the fact that Holmes is not estimated to be eligible for parole until
April 2035.  *See* CDCR Inmate Information, available at https://inmatelocator.cdcr.ca.gov (last visited

have continued to engage in a custom and practice of failing to follow these regulations in their treatment of Plaintiff despite their knowledge over many years of Plaintiff's ongoing medical needs." Doc. No. 131 at 48.

### 3. Conclusion

The Court concludes that, at the very least, Holmes has shown that if he prevails on his Eighth Amendment claims, he may be entitled to prospective injunctive relief. As such, summary judgment in favor of Defendants Diaz, Nasir, and Montgomery is not appropriate.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' motion for summary judgment. Holmes' claims must proceed to trial. However, in light of the ongoing global pandemic and pursuant to Chief Judge Order No. 60, the Court will defer issuing a pretrial scheduling order at this time. The Court **ORDERS** counsel for the parties to jointly contact the chambers of the assigned magistrate judge, within ten (10) business days of the date this Order is filed, for the purpose of scheduling a settlement conference at the convenience of the magistrate judge.

**IT IS SO ORDERED**.

DATE: February 16, 2021

HON. MICHAEL M. ANELLO
United States District Judge

---

2/12/2021). As such, CDCR, CCHCS, and the defendants in this action will be responsible for providing Holmes with constitutionally adequate medical care for the foreseeable future.