1  ROB BONTA
   Attorney General of California
2  RICHARD F. WOLFE
   Supervising Deputy Attorney General
3  LISA L. FREUND
   Deputy Attorney General
4  State Bar No. 249174
     600 West Broadway, Suite 1800
5  San Diego, CA 92101
   P.O. Box 85266
6  San Diego, CA 92186-5266
   Telephone:  (619) 738-9569
7  Fax:  (619) 645-2581
   E-mail:  Lisa.Freund@doj.ca.gov
8  *Attorneys for Defendants E. Estock, M.D., Ralph*
   *Diaz, Warren L. Montgomery, Muhammad Nasir,*
9  *M.D., and Theresa Currier, D.O.*

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              SOUTHERN DISTRICT OF CALIFORNIA

12

13

14  | **CHARLES HOLMES** | Case No. 3:16-cv-02458-MMA-BLM |
15  | **AL-0671,** | **DEFENDANTS' MEMORANDUM OF** |
16  |  | **CONTENTIONS OF FACT AND LAW** |
    |                          Plaintiff, |  |
17  |  | **[Local Rule 16.1.f.2]** |
    |           v. |  |
18  |  |  |
19  | **DR. ESTOCK; DR. BAL; S. CHAIKEN; C.** | Dept:          3A |
    | **REGULES; and DOES 1-3,** | Judge:        The Honorable Michael M. |
20  |  |                      Anello |
    |                        Defendants. | Trial Date:   February 22, 2022 |
21  |  | Action Filed: September 28, 2016 |

22

23       Defendants E. Estock, M.D., Ralph Diaz, Warren L. Montgomery, Muhammad Nasir,

24  M.D., and Theresa Currier, D.O. submit this Memorandum of Contentions of Fact and Law

25  / / /

26  / / /

27  / / /

28  / / /

                                    1

## I.   MATERIAL FACTS

Plaintiff Charles Holmes is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR), currently incarcerated at Calipatria State Prison (Calipatria).

### A.   Facts Ascertained from Medical Records

Holmes was diagnosed with narrowing of the left ureter as a child.  Prior to incarceration, he underwent bladder surgery and a surgical procedure on his left kidney, which were unsuccessful.  Holmes began his incarceration in March 2012 at age 40.  The following paragraphs describe his treatment while incarcerated.[1]

### 1.   2012 and 2013 Medical Treatment

In 2012, Holmes underwent a cystoscopy, a procedure to examine the lining of the bladder and the urethra and an unsuccessful stent insertion and later had a nephrostomy tube placed.[2]  The nephrostomy tube was removed and a left ureteral stent was placed followed by another left ureteral structure dilation and removal and replacement of the left ureteral stent.

Holmes was referred to a new urologist, Dr. Fawcett of Alvarado Hospital, who was optimistic that he may be able to offer a definitive surgical repair.  Dr. Fawcett performed a stent exchange in February 2013 and opined that Holmes' options were to live the way he was, have his left kidney removed, or make one more attempt to repair his left ureter.  Upon reviewing the old surgery records, Dr. Fawcett documented that the surgery he was considering had already been done and that he had no more options for Holmes and recommended another opinion. Holmes was then seen at Loma Linda University by Urologist David Hadley, M.D., who inserted a nephrostomy tube.

/ / /

/ / /

/ / /

---

[1]  Due to his extensive medical care, only a highlight of treatment is included for brevity.
[2]  A nephrostomy tube is a catheter that is inserted through the skin into the kidney in order to drain urine from the body into a collecting bag outside the body.

### 2.     2014 Medical Treatment

In January 2014, Holmes' nephrostomy tube was removed, and a few months later, Dr. Hadley opined that a ureter surgery was not indicated at that time.  Instead, a new stent was placed and then removed in April.  In May, Dr. Hadley placed another nephrostomy tube.  Discharge instructions included flushing of the tube every 12 hours and dressing changes every three days and as needed.  This required a level of nursing care beyond that which could be accomplished in the general population, so Dr. Estock wrote orders for Holmes to be admitted to the Outpatient Housing Unit (OHU), along with orders for nephrostomy flushes and dressing changes as per Dr. Hadley's instructions.

Immediately upon admission to the OHU on May 9, 2014, and up through his discharge from the OHU to a hospital on July 14, 2014, Holmes was noncompliant with the care and management of his tube.  On May 10, 2014, Dr. Estock noted "patient upset, threatening to remove tube because needs housing in OHU for nursing level of care . . . Patient conflicted regarding leaving tube in; agrees reluctantly to do so but refuses nursing irrigation because 'that caused me problems before.'"  Dr. Estock saw Holmes again on May 12, 2014, and documented that she had left a message with Dr. Hadley's office to clarify the duration of tube irrigation, which Holmes was continuing to refuse.

On May 27, 2014, Dr. Hadley saw Holmes again for follow-up and wrote "I am uncomfortable offering the patient any type of reconstruction as it is unclear where his pain is arising from.  I have recommended a second opinion (they also contract with UCSD).  Will continue nephrostomy until he can consult with them."  In fact, CDCR did not contract with UCSD in May 2014.

On June 18, 2014, Holmes was seen by Dr. Hjerpe of Calipatria, who had discussed his care with Dr. Hadley the day before.  Dr. Hjerpe noted that per Dr. Hadley, "#1 nephrostomy tube not for long-term use (can be kept in temporarily pending second opinion), #2 no indication for chronic stenting, #3 no clear indication for any operative intervention, #4 he is recommending second opinion."

1   On his request, Holmes saw Dr. Estock on July 2, 2014.  She documented "[d]iscussed with
2   patient recommendation of Dr. Hadley to leave nephrostomy in until second opinion.  Patient not
3   sure if he desires to.  Continue for now."  During the visit, Holmes did not express any concerns
4   about the frequency of his dressing changes, and on examination, Dr. Estock noted no concerns
5   with the appearance of the nephrostomy tube site, which appeared intact.  Dr. Estock did not visit
6   with Holmes again, and Holmes saw nurses and other doctors after that day.

7   On July 8, 2014, when he was refusing his nephrostomy tube flushing, Holmes stated "I
8   want this taken out [referring to the tube]."  In the nurse's dressing change note, there was no
9   suggestion that the nephrostomy tube site was infected.

10   On July 11, 2014, Holmes complained that his nephrostomy bag was leaking.  A nurse and
11   a nursing supervisor visualized the bag and determined it to be patent without leaks.  By the early
12   morning of July 12, 2014, Holmes' nephrostomy bag was missing.  It was documented that
13   "[p]atient stated I threw it away because I needed a new one."  Multiple nearby hospitals,
14   pharmacies, and other prisons were contacted trying to secure a replacement nephrostomy bag,
15   but no place contacted had any in stock.  Meanwhile, the nephrostomy site was cleaned with
16   alcohol, the dressing changed and covered with sterile gauze.

17   On July 13, 2014, a new nephrostomy bag was obtained and attached.  Nevertheless, by
18   July 14, 2014, a foul-smelling pus was noted to be coming from the nephrostomy site, so he was
19   sent to Pioneer Memorial Hospital for removal of the infected tube.  Dr. Estock was not consulted
20   regarding this decision.

21   From the time the nephrostomy tube was placed on May 9, 2014, until it was removed on
22   July 14, 2014, after Holmes removed the bag in a non-sterile fashion leaving the tube end open
23   and exposed, he was documented to have refused nephrostomy tube flushes on May 10, 11, 12,
24   13, 14, 17, and 30, June 6, 7, 22, 23, 24, 27, 28, and 29, and July 2, 8, and 9.

25   After discharge from the hospital, Holmes was transferred to California State Prison,
26   Sacramento (SAC).  At the new prison, his new Primary Care Provider (PCP), Dr. Ma detailed
27   Holmes' complicated urological history and noted "he is therefore transferred here for second
28   opinion or further evaluation. . . I will write a request for services for him to get a Urology

4

1    consultation for a second opinion.  He needs to go to either UC Davis or UCSF for second

2    opinion" and requested the appointment to be made within three weeks, or sooner, if possible.

3         In September 2014, Holmes visited with urologist Dr. Stoller of UCSF, who reviewed

4    Holmes' history, examined him, and requested further studies.  Holmes again saw Dr. Stoller in

5    October for a cystoscopy and renogram.  Dr. Stoller "recommend that he used timed and double

6    voiding to ensure proper bladder emptying."  This required the use of intermittent bladder self-

7    catheterization on the part of Holmes, who was largely noncompliant with these

8    recommendations.  It was later noted "UCSF wanted patient to have intermittent catheter but

9    patient refuses and wants to have a nephrostomy tube. . . patient refuses intermittent self cath.

10   Patient aware of risks of not following intermittent caths."  Dr. Stoller did not recommend the

11   insertion of a nephrostomy tube and did not recommend he undergo a surgery.

12                **3.    2015 Medical Treatment**

13        In July 2015, Holmes was seen for the final time at UCSF when once again, a

14   recommendation for intermittent catheterization was given.  The doctor noted "[w]e do not think

15   there are surgical options available to him that would improve his current situation."  The doctor

16   also noted that antibiotics should only be provided in limited circumstances.

17                **4.    2016 Medical Treatment**

18        In July 2016, Holmes was transferred back to Calipatria, and his intake form documented

19   that "patient is refusing self-catheterization 'I can urinate myself I don't need self-

20   catheterization.'"  Later that month, he was seen by Dr. Currier, who noted that "patient shows a

21   pattern of drug seeking . . . He is to be presented at pain committee."  This committee consists of

22   numerous doctors, who reviewed Holmes' records and determined that narcotics were not

23   medically indicated.  Instead, the committee determined that non-formulary medications would be

24   prescribed instead.  There is also documentation of Holmes' continued refusals to self-catheterize

25   and refusals of any drugs other than narcotics.

26        In December, Dr. Currier provided Holmes with a number of pain medication options

27   approved by the pain committee, but he stated "I don't want none of your pain meds."  Instead, he

28   remained focused on obtaining "T3's," which are Tylenol with Codeine, an opiate not indicated

                                          5

for chronic pain.  Also documented during that visit, "patient states he caths as directed by Urology but [the Medication Administration Record] shows Holmes refused catheterization supplies on December 2, 3, 4, 5, 7, 10, and 11, 2016."  He also refused his medications December 20, 21, and 22, 2016.

### 5.    2017 Medical Treatment

In January 2017, Dr. Currier requested that Holmes undergo a retrograde urethrogram and ordered Tylenol 3 for acute pain after he underwent the procedure.  On March 27, 2017, Dr. Currier ordered Tylenol 3 for three days after a medical procedure.  In April 2017, Holmes underwent a cystoscopy by Dr. Hadley, and a lesion was found on his bladder wall, which was removed.  Dr. Currier ordered Tylenol 3 for before and after the procedure.  Holmes underwent another cystoscopy with Dr. Hadley, who ordered a few days of antibiotics but no pain medicine.  Dr. Hadley recommended that Holmes not be treated for a UTI with antibiotics if his only complaints are flank pain and painful urination without fever.

### 6.    2018 and 2019 Medical Treatment

On September 4, 2018, Holmes visited with urologist Jill Buckley, M.D. of UCSD, wherein he indicated that he had left flank pain and urological issues.  Dr. Buckley recommended a nephrostomy tube and labs but no opioids.  He got a kink in the tube, and Dr. Currier ordered Tylenol 3.  On November 26, 2018, Holmes had a left ureteral reimplantation, flexible cystoscopy, psoas hitch by Dr. Buckley.

On January 8, 2019, Holmes went to UCSD and had a stent removed; no one from UCSD prescribed an opioid at that time.  Holmes visited with Dr. Buckley again on July 10, 2019 for a cystogram and VCUG.  She noted that "[g]iven his symptoms are relatively mild, would favor conservative management at this time."  Dr. Buckley recommended timed voiding, a process where a patient urinates on a timed schedule.  She made no recommendations that Holmes proceed with any procedures or tests at that time, including surgery, and did not prescribe opioids.

/ / /

/ / /

/ / /

## B.    Prison Grievances

On July 1, 2014, Holmes submitted a Patient-Inmate Health Care Appeal on a CDCR 602-HC form (602-HC) complaining about his medical care.  (SS 137.)  This appeal was designated as Log No. CAL 14033383 (Grievance #1).  (SS 138.)  On July 24, 2014, Dr. Estock interviewed Holmes, who was then housed at SAC, via telephone to respond to Grievance #1.  (SS 139.)  This was not a medical appointment, and instead Holmes was able to articulate his complaints, including his request to see a doctor or be sent to a hospital and to have a second opinion from UCSD.  (SS 140.)  He was also requesting that prison medical staff follow Dr. Hadley's recommendations for a second opinion from UCSD.  (SS 141.)  Dr. Estock wrote a response to Grievance #1, dated July 28, 2014, that Holmes had been seen by a doctor on July 22, 2014 and would be getting a second opinion, but the second opinion would not be from UCSD because it was not a contracted provider with CDCR at that time.  (SS 142.)

On July 1, 2014, Holmes submitted another Patient-Inmate Health Care Appeal on a CDCR 602-HC form (602-HC) requesting that his nephrostomy tube be removed before he was transferred to SAC. [3]  (SS 143)  This appeal was designated as Log No. CAL HC 14033371 (Grievance #2).  (SS 144.)

Holmes submitted another 602-HC on August 16, 2016 in which he complained that while housed at SAC, he was on methadone for pain but upon transfer back to CAL in July 2016, he was informed that he had to get off methadone and was placed in the OHU.  (SS 145.)  This appeal was designated as Log No. CAL HC 16034017 (Grievance #3).  (SS 146.)  After the first level of review of Grievance #3 was denied, Holmes brought Grievance #3 to the second level of review and complained that Dr. Currier did not test his urine to determine the type of infection he had or treat him with antibiotics.  (SS 147.)  On November 21, 2016, a letter was sent to Holmes indicating that his second level of review was denied.  (SS 148.)  In the letter, Holmes was "advised that his issue may be submitted for a Director's Level Review within the 30 days of receipt of this response if he desires."  (SS 149.)  Holmes did not submit Grievance #3 to a third

---

[3] The Grievance numbers (#1, #2, and #3) do not reflect the number of 602 forms filed by Holmes.  They are merely used to distinguish between the three 602 forms discussed in this motion.

1   level of review.  (SS 150.)  Grievance #3 was the only 602 form submitted by Holmes wherein

2   Dr. Currier was named.  (SS 151.)

3   **II.      POINTS OF RELEVANT LAW**

4         **A.      Deliberate Indifference**

5         To prove an Eighth Amendment violation, an inmate must show that the doctor acted with

6   deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 103-104

7   (1976).  "[T]he [inmate] must show that the course of treatment the doctors chose was medically

8   unacceptable under the circumstances and that the defendants chose this course in conscious

9   disregard to an excessive risk to the plaintiff's health."  *Hamby v. Hammond*, 821 F.3d 1085,

10  1092 (9th Cir. 2016) (internal quotation marks and citation omitted).  "Deliberate indifference is a

11  high legal standard.  A showing of medical malpractice or negligence is insufficient to establish a

12  constitutional deprivation under the Eighth Amendment."  *Toguchi v. Chung*, 391 F.3d 1051,

13  1060 (9th Cir. 2004).  A difference of opinion regarding the proper course of treatment is also

14  insufficient to establish an Eighth Amendment claim.  *Hamby*, 821 F.3d at 1092.

15            **1.      Dr. Estock**

16        After the implementation of the nephrostomy tube in May 2014, Holmes was admitted to

17  the OHU on Dr. Estock's order to be seen by nursing staff three times a day and a doctor every 14

18  days, although the doctor and nursing staff could not always be the same, so he saw various

19  doctors during his stay in the OHU.  Had Holmes not been incarcerated, he would be responsible

20  for cleaning and flushing his tube on his own without any nursing care or doctor assistance.

21        Dr. Estock only visited with Holmes on a few occasions after his May 2014 nephrostomy

22  tube insertion in order to counsel him to follow the urologist's cleaning and care instructions and

23  to encourage him to leave the tube in his body.  Rather than following the urologist's orders,

24  Holmes repeatedly failed to comply with the tube cleaning and even went so far as to remove the

25  bag attached to the tube in a non-sterile fashion, which caused the tube end to be open and

26  exposed, leading to an infection that required the removal of the tube.  During the time that

27  Holmes had the nephrostomy tube inserted, he was seen by nursing staff three times a day and

28  saw a doctor at least every fourteen days.  Holmes has not presented a shred of evidence that Dr.

8

1    Estock was aware of the infection that Holmes eventually had due to his repeated refusal of

2    medical care and the removal of the nephrostomy bag or that she had anything to do with the

3    infection or subsequent care after the infection took hold.  Under section 1983, there is no

4    respondeat superior.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted).

5    Because there is no respondeat superior under § 1983, a government official may be held liable

6    only for his own conduct.  *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1097 (9th Cir. 2013).  If

7    a nurse or other doctor was not performing their job correctly, such inadequacies would lie at

8    their own feet, and not the feet of Dr. Estock.

9         To have the recommended second opinion, Holmes was transferred to another prison and

10   was not seen by Dr. Estock prior to the transfer.  Contrary to Holmes' assertion, Dr. Estock has

11   no control over the transfer of inmates, which is a custody decision.  Once Holmes was

12   transferred, Dr. Estock had no authority over his care and had no further medical visits with him.

13   Instead, he saw medical staff right away at the new facility in order for the new staff to take over

14   his care and implement a plan for obtaining a second opinion.  The new prison doctor ordered a

15   consult with a urologist at UCSF, a world-renowned urology facility.  That new urologist at

16   UCSF did not recommend any surgical intervention and did not recommend that the Holmes have

17   a new nephrostomy tube inserted.  Holmes will not be able to carry his burden at trial to show that

18   Dr. Estock was deliberately indifferent, and the law does not support his claim against her.

19            **2.    Dr. Currier**

20        The allegations against Dr. Currier are even weaker.  He contends that she is deliberately

21   indifferent because she refused to provide him with pain medication and antibiotics.  This is

22   untrue.  She refused to provide Holmes with narcotics at his demand.  Instead, she offered him

23   alternative pain medications as instructed by the prison's pain committee, which he refused and

24   provided him narcotics when medically indicated.  She also followed all urologists'

25   recommendations to cease the prescription of antibiotics, except in very limited circumstances

26   given that he has resistance to many antibiotics.  The fact that Holmes and Dr. Currier disagree as

27   to his medical care does not amount to deliberate indifference.  Disagreements over "matter[s] for

28

9

1    medical judgment," such as whether additional tests or treatments are required, are insufficient to

2    establish a constitutional violation.  *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

3    **B.    Qualified Immunity**

4        Qualified immunity protects "government officials…from liability for civil damages insofar

5    as their conduct does not violate a clearly established statutory or constitutional right of which a

6    reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  The

7    Supreme Court reminded that the sweep of qualified immunity is broad.  "Qualified immunity

8    gives government officials breathing room to make reasonable but mistaken judgments about

9    open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those

10   who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley*

11   *v. Briggs*, 475 U.S. 335, 341(1986)).

12       The doctrine also means that "officials should not err always on the side of caution"

13   because they fear being sued. *Davis v. Scherer*, 468 U.S. 183, 196 (1984); *Mitchell v. Forsyth*,

14   472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions"

15   they took).  To determine whether a defendant is entitled to qualified immunity, the court must

16   first determine whether the facts shown by the plaintiff make out a violation of a constitutional

17   right, and second, if so, whether the right was clearly established at the time of the violation.

18   *Saucier v. Katz*, 533 U.S. 194, 199 (2001).  For a right to be clearly established, "existing

19   precedent must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563

20   U.S. at 741.  The Supreme Court has directed that the right must be clearly established in a

21   particularized context, thus, "whether a right is clearly established turns on 'whether it would be

22   clear to a reasonable officer that his conduct was unlawful in the situation confronted.'" *Conner*

23   *v. Heiman,* 672 F.3d 1126, 1132 (9th Cir. 2012) (quoting *Saucier, supra,* 533 U.S. at 202.)

24       In order to defeat defendants' claims of qualified immunity, Holmes has the burden of

25   demonstrating a "robust 'consensus of cases of persuasive authority'" exist which demonstrate

26   that Defendants' actions were clearly unlawful. *Al-Kidd,* 563 U.S. at 741-742 (quoting *Wilson v.*

27   *Layne,* 526 U.S. 603, 617 (1999).  It is not enough for Heilman to simply say, for example, that

28   the Eighth Amendment prohibits cruel and unusual punishment, or that prison medical officials

should not be deliberately indifferent to a prisoner's medical needs.  He must identify clearly established case law violated by Defendants in the fact-specific context of this case.

More recently, in *Hamby v. Hammond*, 821 F.3d 1085 (9th Cir. 2016), the Ninth Circuit affirmed summary judgment based on qualified immunity for prison medical officials against a prisoner who brought a § 1983 action, alleging deliberate indifference in delaying surgery to repair his hernia and failing to diagnose and treat his inguinal hernia.  The Court observed, "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would have understood that *what he is doing* violates that right."  *Hamby*, 821 F.3d at 1090 (Citation omitted) (Emphasis added).  Towards this end, "existing precedent must have placed the . . . constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.

**C.    Injunctive Relief**

Preliminary injunctions are "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Where a party seeks to enjoin a government agency, "his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs."  *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (citations and internal quotation marks omitted).  "'[J]udicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'"  *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995).

Here, Holmes has never set forth the injunctive relief he seeks against defendants Diaz, Montgomery, or Nasir besides an indication that he would like to continue receiving treatment from Dr. Buckley but without any indication or plan for how that would occur.  (Third Am. Compl., ECF No. 81.)  Without a clear picture of the type of injunctive relief sought, combined with the fact that no doctor is currently offering Holmes a surgical solution, it is virtually impossible for this Court to award injunctive relief.

**III.    ABANDONED ISSUES**

All defendants but defendants E. Estock, M.D., Ralph Diaz, Warren L. Montgomery, Muhammad Nasir, M.D., and Theresa Currier, D.O. were voluntarily dismissed by Holmes.

IV. **EXHIBITS**

See Exhibit A hereto.

V. **WITNESSES**

1.      Defendant E. Estock, M.D., c/o defense counsel.  Dr. Estock is a medical doctor employed by CDCR, who will testify about physician and medical care practices and procedures within CDCR.  She will also testify as to Holmes' medical treatment, causes, prognosis, damages, and her opinions concerning defendants' alleged deliberate indifference.  She will testify as a non-retained expert witness.

2.      Defendant Theresa Currier, D.O., c/o defense counsel.  Dr. Currier is Doctor of Osteopathy and a former employee of CDCR, who will testify about physician and medical care practices and procedures within CDCR.  She will also testify as to Holmes' medical treatment, causes, prognosis, damages, and her opinions concerning defendants' alleged deliberate indifference.  She will testify as a non-retained expert witness.

3.      Bennett Feinberg, M.D., CCHP, California Correctional Health Care Services, PO Box 588500, Elk Grove, CA 95758, (916) 691-6648.  Dr. Feinberg graduated from the University of California at San Francisco School of Medicine in 1994 and is licensed to practice medicine by the State of California.  Dr. Feinberg will testify as an expert regarding Holmes' medical treatment, diagnoses, causes, prognosis, damages, the healthcare policies and procedures within the CDCR medical system, and his opinions concerning defendants' alleged deliberate indifference.  Dr. Feinberg will also rebut Holmes' expert's testimony and other medical providers, if necessary.

4.      Richard Boxer, M.D., 1143 Linda Flora Drive, Los Angeles, CA  90049-1829, (305) 281-3621.  Dr. Boxer graduated with his medical degree from the University of Wisconsin in 1973, has been licensed to practice medicine by the State of California since 1974, and completed his urology residency at UCLA in 1979.  Dr. Boxer will testify as an expert regarding Holmes' medical treatment, causes, prognosis, damages, and his opinions concerning defendants' alleged deliberate indifference.  Dr. Boxer will also rebut Holmes' expert's testimony and other medical providers, if necessary.

1       5.     Nathaniel Gilmore, SSMII, c/o defense counsel;

2       6.     S. Gates, Chief, c/o defense counsel;

3       7.     M. Estrada, R.N., c/o defense counsel.  M. Estrada is a registered nurse employed by

4 CDCR, who treated Holmes at Calipatria.  She is expected to testify as to the medical treatment

5 Holmes received at Calipatria and her opinions pertaining to that treatment and Holmes' medical

6 condition.  She will testify as a non-retained expert witness.

7       8.     G. Dagdagan, R.N., c/o defense counsel.  G. Dagdagan is a registered nurse employed

8 by CDCR, who treated Holmes at Calipatria.  She is expected to testify as to the medical

9 treatment Holmes received at Calipatria and her opinions pertaining to that treatment and

10 Holmes' medical condition.  She will testify as a non-retained expert witness.

11       9.     E. Stepp, R.N., c/o defense counsel.  E. Stepp is a registered nurse employed by

12 CDCR, who treated Holmes at Calipatria.  She is expected to testify as to the medical treatment

13 Holmes received at Calipatria and her opinions pertaining to that treatment and Holmes' medical

14 condition.  She will testify as a non-retained expert witness.

15       10.    Defendant Kathleen Allison, c/o defense counsel;

16       11.    Defendant Warren L. Montgomery, c/o defense counsel;

17       12.    Defendant Muhammad Nasir, M.D., c/o defense counsel. Dr. Nasir is a medical

18 doctor employed by CDCR, who will testify about physician and medical care practices and

19 procedures within CDCR.  He will also testify as to Holmes' medical treatment, causes,

20 prognosis, damages, and his opinions concerning defendants' alleged deliberate indifference.  He

21 will testify as a non-retained expert witness.

22       13.    Marshall L. Stoller, M.D., 400 Parnassus Avenue, Suite A610, San

23 Francisco, CA  94143, (415) 353-2200.  Dr. Stoller is believed to be a medical doctor, who

24 treated Holmes at UCSF.  He is expected to testify as to the medical treatment Holmes received at

25 UCSF and his opinions pertaining to that treatment and Holmes' medical condition.  He will

26 testify as a non-retained expert witness.

27       14.    Michael Kim, M.D., c/o defense counsel.  Dr. Kim was a medical doctor employed by

28 CDCR, who treated Holmes at Calipatria.  He is expected to testify as to the medical treatment

Holmes received at Calipatria and his opinions pertaining to that treatment and Holmes' medical condition.  He will testify as a non-retained expert witness.

      15.    David E. Hjerpe, M.D., c/o defense counsel.  Dr. Hjerpe was a medical doctor employed by CDCR, who treated Holmes at Calipatria.  He is expected to testify as to the medical treatment Holmes received at Calipatria and his opinions pertaining to that treatment and Holmes' medical condition.  He will testify as a non-retained expert witness.

      16.    Litigation Coordinator Porfirio Nava, c/o defense counsel;

      17.    Custodian of Records, Calipatria State Prison, 7018 Blair Road, Calipatria, CA 92233, (760) 348-700;

      18.    Custodian of Records, University of San Francisco Medical Center, 6425 Christie Abe, Emeryville, CA  94608;

      19.    Custodian of Records, University of San Diego Medical Center, 200 W. Arbor Drive, San Diego, CA  92103;

      20.    Custodian of Records, Loma Linda University Medical Center, 101 E. Redlands Boulevard, San Bernardino, CA  92408;

      21.    Custodian of Records, Pioneer Memorial Healthcare District, 207 West Legion Road, Brawley, CA  92227; and

      22.    Plaintiff Charles Holmes.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1    Dated:  December 10, 2021                Respectfully submitted,

2                                     ROB BONTA
                                     Attorney General of California

3                                     RICHARD F. WOLFE
                                     Supervising Deputy Attorney General

4

5                                     *s/ Lisa L. Freund*
                                     LISA L. FREUND

6                                     Deputy Attorney General
                                     *Attorneys for Defendants*

7                                     *E. Estock, M.D., Ralph Diaz, Warren L.*
                                     *Montgomery, Muhammad Nasir, M.D.,*

8                                     *and Theresa Currier, D.O.*

9    SD2017703609

10   83161555.docx

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

*Holmes, Charles v. E. Estock, M.D., et al.*

**Southern District Case No. 3:16-cv-02458-MMA-BLM**

**DEFENDANTS' EXHIBIT LIST**

# UNITED STATES DISTRICT COURT

## For the Southern District of California

### Case Title:  *Holmes v. Estock, et al.*

### 3:16-cv-02458-MMA-BLM

### DEFENDANTS' EXHIBIT LIST

| NO. | DATE MARKED | DATE ADMITTED | DESCRIPTION |
|---|---|---|---|
| A | | | Progress Note, dated September 17, 2014, authored by Marshall L. Stoller, M.D. |
| B | | | Health Care Services Physician Request for Services, dated July 28, 2014, authored by Jian Ma, M.D. |
| C | | | Medical Classification Chrono, dated June 27, 2014, authored by E. Estock, M.D. |
| D | | | Corcoran District Hospital History and Physical Examination report, dated May 18 or 21, 2012, authored by Rajendra Dwivedi, M.D. |
| E | | | Corcoran District Hospital Operative Report, dated May 18 or 21, 2012, authored by Rajendra Dwivedi, M.D. |
| F | | | Discharge Summary, dated May 24, 2012, authored by Ingy N. Ayad, M.D. |
| G | | | Final Report, dated August 28, 2012, authored by Russell K. Paul, M.D. |
| H | | | Operative Report, dated September 18, 2012, authored by Anthony Horan, M.D. |
| I | | | Primary Care Provider Progress Note, dated October 1, 2012, authored by V. Pinboo, LVN |

| | | | |
|---|---|---|---|
| J | | | Telemedicine Custody Consultation, dated November 30, 2012, authored by James Fawcett, M.D. |
| K | | | Primary Care Provider Progress Note, dated February 14, 2013, authored by unknown |
| L | | | Telemedicine Custody Consultation, dated March 5, 2013, authored by James Fawcett, M.D. |
| M | | | Interdisciplinary Progress Note, dated February 6, 2013, authored by various nurses |
| N | | | Telemedicine Custody Consultation, dated June 18, 2013, authored by James Fawcett, M.D. |
| O | | | Alvarado Hospital operative report, dated August 28, 2013, authored by James Fawcett, M.D. |
| P | | | Alvarado Hospital report, dated August 28, 2013, authored by Rodney Hood, M.D. |
| Q | | | Letter from David Hadley, M.D. of Loma Linda University Health System to Katrina Ball, D.O., dated October 13, 2013 |
| R | | | Discharge Summary, dated October 29, 2013, authored by David Hadley, M.D. |
| S | | | Physician's Orders, dated October 29, 2013, authored by A. Lopez, M.D. |
| T | | | Progress Notes, dated October 17, 2013, authored by David Hadley, M.D. |
| U | | | Progress Notes, dated November 26, 2013, authored by David Hadley, M.D. |
| V | | | Medical Classification Chrono, dated February 12, 2014, authored by David E. Hjerpe, M.D. |
| W | | | Health Care Services Physician Request for Services, dated February 13, 2014, authored by M. Kim, M.D. |
| X | | | Medical Classification Chrono, dated February 14, 2014, authored by David E. Hjerpe, M.D. |

| | | | |
|---|---|---|---|
| Y | | | Telephone Progress Note, dated March 21, 2014, authored by David E. Hjerpe, M.D. |
| Z | | | Chart Note, dated March 20, 2014, authored by David E. Hjerpe, M.D. |
| AA | | | Discharge Summary, dated May 9, 2014, authored by David Hadley, M.D. |
| AB | | | Patient Instructions, dated May 9, 2014, authored by David Hadley, M.D. |
| AC | | | Physician's Orders, dated May 9, 2014, authored by E. Estock, M.D. |
| AD | | | Interdisciplinary Progress Notes, dated May 9, 2014, authored by unknown |
| AE | | | Admission Assessment, dated May 9, 2014, authored by unknown registered nurse |
| AF | | | Nursing Care Record, dated May 9 and 10, 2014, authored by various registered nurses |
| AG | | | Intake History and Physical Form, dated May 10, 2014, authored by E. Estock, M.D. |
| AH | | | Primary Care Provider Progress Note, dated May 12, 2014, authored by E. Estock, M.D. |
| AI | | | Progress Notes, dated May 28, 2014, authored by David Hadley, M.D. |
| AJ | | | Interdisciplinary Progress Notes, dated May 31, 2014, authored by unknown |
| AK | | | Nursing Care Record, dated June 5, 2014, authored by various registered nurses |
| AL | | | Nursing Care Record, dated June 5, 2014, authored by various registered nurses |
| AM | | | Nursing Care Record, dated June 6, 2014, authored by various registered nurses |
| AN | | | Medical Progress Note, dated June 9, 2014, authored by Michael Kim, M.D. |

| AO | | | Nursing Care Record, dated June 17, 2014, authored by various registered nurses |
|---|---|---|---|
| AP | | | Nursing Care Record, dated June 17, 2014, authored by various registered nurses |
| AQ | | | Primary Care Provider Progress Note, dated June 18, 2014, authored by David E. Hjerpe, M.D. |
| AR | | | Medical Classification Chrono, dated June 27, 2014, authored by E. Estock, M.D. |
| AS | | | Primary Care Provider Progress Note, dated July 2, 2014, authored by E. Estock, M.D. |
| AT | | | Nursing Care Record, dated July 3, 2014, authored by various registered nurses |
| AU | | | Refusal of Examination and/or Treatment, dated July 8, 2014, authored by L. Sepulveda, R.N. |
| AV | | | Interdisciplinary Progress Notes, dated July 8 and 11, 2014, authored by various registered nurses |
| AW | | | Health Care Services Physician Request for Services, dated July 10, 2014, authored by E. Estock, M.D. |
| AX | | | Nursing Care Record, dated July 11, 2014, authored by various registered nurses |
| AY | | | Nursing Care Record, dated July 12, 2014, authored by various registered nurses |
| AZ | | | Nursing Care Record, dated July 12, 2014, authored by various registered nurses |
| BA | | | Interdisciplinary Progress Notes, dated July 12, 2014, authored by various registered nurses |
| BB | | | Nursing Care Record, dated July 13, 2014, authored by various registered nurses |
| BC | | | TTA Note, dated July 14, 2014, authored by Michael Kim, M.D. |

| | | | |
|---|---|---|---|
| BD | | | Physician's Orders, dated July 14, 2014, authored by various doctors |
| BE | | | Refusal of Examination and/or Treatment, dated May 9, 2014, authored by J. Antunez, R.N. and M. Deleon |
| BF | | | Nursing Care Record, dated June 28, 2014, authored by various registered nurses |
| BG | | | Nursing Care Record, dated July 2, 2014, authored by various registered nurses |
| BH | | | Nursing Care Record, dated May 12, 2014, authored by various registered nurses |
| BI | | | Nursing Care Record, dated May 10, 2014, authored by various registered nurses |
| BJ | | | Refusal of Examination and/or Treatment, dated May 10, 2014, authored by M. Estrada, R.N. |
| BK | | | Nursing Care Record, dated May 11, 2014, authored by various registered nurses |
| BL | | | Refusal of Examination and/or Treatment, dated May 12, 2014, authored by E. Stepp |
| BM | | | Nursing Care Record, dated May 13, 2014, authored by various registered nurses |
| BN | | | Nursing Care Record, dated May 14, 2014, authored by various registered nurses |
| BO | | | Refusal of Examination and/or Treatment, dated May 17, 2014, authored by G. Dagdagan, R.N. |
| BP | | | Refusal of Examination and/or Treatment, dated May 30, 2014, authored by H. Rangelu and M. Estrada, R.N. |
| BQ | | | Refusal of Examination and/or Treatment, dated June 6, 2014, authored by various registered nurses |
| BR | | | Refusal of Examination and/or Treatment, dated June 7, 2014, authored by various registered nurses |

| | | | |
|---|---|---|---|
| BS | | | Refusal of Examination and/or Treatment, dated June 22, 2014, authored by M. Estrada, R.N. |
| BT | | | Refusal of Examination and/or Treatment, dated June 23, 2014, authored by various registered nurses |
| BU | | | Refusal of Examination and/or Treatment, dated June 24, 2014, authored by various registered nurses |
| BV | | | Refusal of Examination and/or Treatment, dated June 24, 2014, authored by J. Antunez, R.N. and J. Nunez, R.N. |
| BW | | | Refusal of Examination and/or Treatment, dated June 27, 2014, authored by various registered nurses |
| BX | | | Refusal of Examination and/or Treatment, dated June 29, 2014, authored by various registered nurses |
| BY | | | Refusal of Examination and/or Treatment, dated June 29, 2014, authored by various registered nurses |
| BZ | | | Refusal of Examination and/or Treatment, dated July 2, 2014, authored by various registered nurses |
| CA | | | Refusal of Examination and/or Treatment, dated July 9, 2014, authored by various registered nurses |
| CB | | | Nursing Care Record, dated May 10, 2014, authored by various registered nurses |
| CC | | | Nursing Care Record, dated May 29, 2014, authored by various registered nurses |
| CD | | | Nursing Care Record, dated May 30, 2014, authored by various registered nurses |
| CE | | | Nursing Care Record, dated June 5, 2014, authored by various registered nurses |
| CF | | | Nursing Care Record, dated June 13, 2014, authored by various registered nurses |

| | | | |
|---|---|---|---|
| CG | | | Nursing Care Record, dated June 16, 2014, authored by various registered nurses |
| CH | | | Nursing Care Record, dated June 17, 2014, authored by various registered nurses |
| CI | | | Nursing Care Record, dated June 18, 2014, authored by various registered nurses |
| CJ | | | Nursing Care Record, dated June 21, 2014, authored by various registered nurses |
| CK | | | Nursing Care Record, dated June 22, 2014, authored by various registered nurses |
| CL | | | Nursing Care Record, dated June 23, 2014, authored by various registered nurses |
| CM | | | Nursing Care Record, dated June 24, 2014, authored by various registered nurses |
| CN | | | Nursing Care Record, dated June 25, 2014, authored by various registered nurses |
| CO | | | Nursing Care Record, dated June 26, 2014, authored by various registered nurses |
| CP | | | Nursing Care Record, dated June 27, 2014, authored by various registered nurses |
| CQ | | | Nursing Care Record, dated June 28, 2014, authored by various registered nurses |
| CR | | | Nursing Care Record, dated June 29, 2014, authored by various registered nurses |
| CS | | | Nursing Care Record, dated June 30, 2014, authored by various registered nurses |
| CT | | | Nursing Care Record, dated July 1, 2014, authored by various registered nurses |
| CU | | | Nursing Care Record, dated July 2, 2014, authored by various registered nurses |

| | | | |
|---|---|---|---|
| CV | | | Nursing Care Record, dated July 3, 2014, authored by various registered nurses |
| CW | | | Nursing Care Record, dated July 4, 2014, authored by various registered nurses |
| CX | | | Nursing Care Record, dated July 5, 2014, authored by various registered nurses |
| CY | | | Nursing Care Record, dated July 6, 2014, authored by various registered nurses |
| CZ | | | Nursing Care Record, dated July 7, 2014, authored by various registered nurses |
| DA | | | Nursing Care Record, dated July 8, 2014, authored by various registered nurses |
| DB | | | Nursing Care Record, dated July 9, 2014, authored by various registered nurses |
| DC | | | Nursing Care Record, dated July 10, 2014, authored by various registered nurses |
| DD | | | Nursing Care Record, dated July 11, 2014, authored by various registered nurses |
| DE | | | Nursing Care Record, dated July 12, 2014, authored by various registered nurses |
| DF | | | Nursing Care Record, dated July 13, 2014, authored by various registered nurses |
| DG | | | Physician's Orders, dated July 18, 2014, authored by Jian. Ma, M.D. |
| DH | | | Intake History and Physical Form, dated July 9, 2016, authored by A. Lopez |
| DI | | | Physician's Orders, dated July 12, 2016, authored by E. Estock, M.D. |
| DJ | | | Primary Care Progress Note, dated July 14, 2016, authored by T. Currier, D.O. |
| DK | | | Primary Care Progress Note, dated July 28, 2016, authored by T. Currier, D.O. |

| | | | |
|---|---|---|---|
| DL | | | Health Care Services Physician Request for Services, dated August 18, 2016, authored by T. Currier, D.O. |
| DM | | | Primary Care Provider Progress Note, dated September 7, 2016, authored by T. Currier, D.O. |
| DN | | | Interdisciplinary Progress Notes, dated September 7, 2016, authored by B. Stepke, M.D. |
| DO | | | Primary Care Provider Progress Note, dated September 19, 2016, authored by T. Currier, D.O. |
| DP | | | Telemedicine Custody Consultation, dated October 6, 2016, authored by James Fawcett, M.D. |
| DQ | | | Primary Care Provider Progress Note, dated October 17, 2016, authored by T. Currier, D.O. |
| DR | | | Primary Care Provider Progress Note, dated December 14, 2016, authored by T. Currier, D.O. |
| DS | | | Loma Linda University Medical Center medical report, dated December 19, 2016, authored by Dean A. Hadley, M.D. |
| DT | | | Health Care Services Physician Request for Services, dated December 28, 2016, authored by T. Currier, D.O. |
| DU | | | Health Care Services Physician Request for Services, dated January 25, 2017, authored by T. Currier, D.O. |
| DV | | | Primary Care Provider Progress Note, dated February 23, 2017, authored by T. Currier, D.O. |
| DW | | | Physician's Orders, dated March 27, 2017, authored by T. Currier, D.O. |
| DX | | | Loma Linda University Medical Center medical report, dated April 21, 2017, authored by Dean A. Hadley, M.D. |
| DY | | | Health Care Services Physician Request for Services, dated May 1, 2017, authored by T. Currier, D.O. |

| | | | |
|---|---|---|---|
| DZ | | | Loma Linda University Medical Center medical report, dated August 17, 2017, authored by Dean A. Hadley, M.D. |
| EA | | | Physician's Orders, dated May 1, 2017, authored by T. Currier, D.O. |
| EB | | | Medication List, dated August 17, 2017, authored by T. Currier, D.O. |
| EC | | | Progress Note, dated December 27, 2017, authored by Dean A. Hadley, M.D. |
| ED | | | Progress Notes, dated June 11, 2018, authored by T. Currier, D.O. |
| EE | | | Inpatient Chart Report, dated September 4, 2018, authored by Jill C. Buckley, M.D. |
| EF | | | Inpatient Chart Report, dated September 10, 2018, authored by Carl K. Hoh, M.D. |
| EG | | | Inpatient Chart Report, dated October 2, 2018, authored by Thomas B. Kinney, M.D. |
| EH | | | University of California San Diego Medical Center prescription, dated October 2, 2018, authored by Thomas B. Kinney, M.D. |
| EI | | | Inpatient Chart Report, dated October 10, 2018, authored by Jill C. Buckley, M.D. |
| EJ | | | Provider Telephone/Consultation Note, dated October 20, 2018, authored by T. Currier, D.O. |
| EK | | | Chronic Care Intake, dated July 22, 2014, authored by Jian Ma, M.D. |
| EL | | | Health Care Services Physician Request for Services, dated July 28, 2014, authored by Jian Ma, M.D. |
| EM | | | UCSF Medical Center medical report, dated September 17, 2014, authored by Marshall Stoller, M.D. |

| EN | | | UCSF Medical Center medical report, dated October 8, 2014, authored by Marshall Stoller, M.D. |
|----|--|--|----------------------------------------------------------------------------------------------|
| EO | | | Primary Care Provider Progress Note, dated December 9, 2014, authored by Jian Ma, M.D. |
| EP | | | Medical Encounter Note, dated March 3, 2015, authored by Jian Ma, M.D. |
| EQ | | | UCSF Medical Center Progress Notes, dated July 15, 2015, authored by Marshall L. Stoller, M.D. |
| ER | | | Medical Progress Note, dated September 4, 2015, authored by Jian Ma, M.D. |
| ES | | | Pioneers Memorial Healthcare District medical report, dated October 31, 2018, authored by Brent Butcher, M.D. |
| ET | | | UCSD Health Inpatient Chart Report, dated November 26-27, 2018, authored by Richard A. Owusu, M.D. |
| EU | | | UCSD Health Inpatient Chart Report, dated July 10, 2019, authored by Jill C. Buckley, M.D. |
| EV | | | UCSD Health Inpatient Chart Report, dated January 8, 2019, authored by Jill C. Buckley, M.D. |
| EW | | | UCSD Health Inpatient Chart Report, dated July 10, 2019, authored by Jill C. Buckley, M.D. |
| EX | | | Interrogatories to Plaintiff from Defendant E. Estock, M.D., Set One |
| EY | | | Plaintiff's Responses to Defendant E. Estock, M.D. Interrogatories |
| EZ | | | Curriculum Vitae of Bennett Fienberg, M.D. |
| FA | | | Curriculum Vitae of Richard Boxer, M.D. |
| FB | | | Bennett Feinberg, M.D.'s expert witness report, dated November 3, 2017, and supporting documents |

| FC | | | Richard Boxer's expert witness report, dated November 18, 2018, and supporting documents |
|---|---|---|---|
| FD | | | Plaintiff's Complaint |
| FE | | | Plaintiff's First Amended Complaint |
| FF | | | Plaintiff's Second Amended Complaint |
| FG | | | Plaintiff's Third Amended Complaint |
| FH | | | Transcript of Deposition of Charles Holmes |
| FI | | | Charles Holmes' subpoenaed C-File from the California Department of Corrections and Rehabilitation |
| FJ | | | Charles Holmes' subpoenaed medical records from the California Department of Corrections and Rehabilitation |
| FK | | | Charles Holmes' subpoenaed medical records from Pioneer Memorial Hospital |
| FL | | | Charles Holmes' subpoenaed medical records from Loma Linda University Medical Center |
| FM | | | Charles Holmes' subpoenaed medical records from USCF Medical Center |
| FN | | | Charles Holmes' subpoenaed medical records UCSD Health |
| FO-GZ | | | Reserved |

SD2015803064
83161556.docx

## CERTIFICATE OF SERVICE

| Case Name: | **Holmes, Charles v. Estock, et al.** | No. | **3:16-cv-02458-MMA-BLM** |
|---|---|---|---|

I hereby certify that on <u>December 10, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>December 10, 2021</u>, at San Diego, California.

| K. Towne | *K. Towne* |
|---|---|
| Declarant | Signature |

SD2017703609
83162681.docx